724 P.2d 1

**STATE of Arizona, Appellee,**

v.

**William Abad CASTANEDA, Appellant.**

**No. 6443.**

Supreme Court of Arizona,
In Banc.

June 10, 1986.

Reconsideration Denied Sept. 9, 1986.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Galen Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

O'Dowd, Burke & Lundquist by Bruce Burke, Tucson, for appellant.

CAMERON, Justice.

Defendant, William Abad Castaneda, was convicted of six counts of sexual conduct with a minor under fifteen, A.R.S. § 13-1405, two counts of kidnapping, A.R.S. § 13-1304, and one count of first degree murder, A.R.S. § 13-1105. Defendant was sentenced to death for first degree murder. He also received 28 years on each of four counts, the sentences run concurrently to each other but consecutively to a previous sentence reimposed upon revocation of probation. On the four remaining counts, defendant was sentenced to 28 years on each count. These sentences are concurrent to each other but consecutive to the first four counts. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13-4031, -4035.

Defendant presents several issues for review:

A. Pretrial
 1. Was it error for the trial court to fail to suppress defendant's out-of-court statements?
 2. Was it error for the trial court to fail to suppress the out-of-court and in-court identifications of defendant?
 3. Was it error for the trial court to fail to suppress evidence obtained as a result of a search of defendant's business?

B. Trial
 1. Did the trial court err in allowing the prosecutor to present evidence of a prior bad act?
 2. Did the trial court err in admitting allegedly gruesome photographs?

C. Post-trial
 1. Did the trial court properly allow defendant's admission of his prior convictions?
 2. Was the death sentence properly imposed?
 3. Was defendant's trial counsel ineffective?

The facts follow. On 6 May 1984, Joel and Michael, both age twelve, went to a chess tournament in downtown Tucson. Between matches, they decided to take a walk. While resting near a store, they encountered defendant, who drove up next to them in a pickup truck. Defendant talked to the two boys about making some money doing yardwork. Defendant then forced the boys into his truck. He told the boys to get under the dashboard and to be quiet.

He drove the boys to his business, an automobile repair shop. He placed Joel in the bathroom and put Michael on a bed in an adjacent room. While in the bathroom, Joel heard slapping sounds and Michael crying. Later, defendant removed Joel from the bathroom. Michael did not have on any clothes, and defendant forced Joel to remove his clothes also. Defendant then performed various sexual acts on both boys and forced them to perform fellatio on him. While this was happening, visitors arrived at defendant's business. Defendant forced both boys to hide under some boxes, telling them that the visitors were maniacs and would kill them. Defendant then went into an outer office and talked to the visitors. The visitors were defendant's father and his father's neighbor; they had come to borrow a ladder. After the visitors left, defendant returned to the boys, told them to dress, put them into his truck, and began driving.

Defendant took the boys to a desert area north of Tucson. Defendant told the boys

they would become "blood brothers to the Indians." He forced Michael to get out of the truck and locked Joel inside. Defendant forced Michael to remove all his clothes and to walk about a hundred yards across the desert. Joel heard Michael screaming that he did not want to die and that he loved his parents. Joel crawled out of a partially opened window and started running. He had run only a short distance when he heard Michael's screaming stop suddenly. Joel kept running and after wandering in the desert for several hours he met two boys riding three-wheelers. They took Joel to a police station where he told detectives of the incident.

Police set up a command post in the area described by Joel and began to search for Michael. During the search, the police encountered defendant on foot and arrested him. By this time it was past midnight. With defendant's assistance, the police located Michael. He was found dead, lying naked under a tree. The condition of the body indicated Michael had been sexually abused and repeatedly stabbed. Defendant was tried, convicted, and sentenced. He now appeals.

## ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Immediately after his arrest, defendant was given his *Miranda* warnings, and he responded "I have nothing to say." An officer put defendant into the back of a police vehicle. Then, defendant asked to speak with his sister, who was at the scene. The officers allowed her to get into the car to talk privately with defendant. The officers did not solicit defendant's sister to talk with him. After they had finished talking, defendant's sister got out of the car and told the officers, "He will take you to the vehicle." Defendant said, however, that he would not take them until his sister left the scene. An officer told defendant's sister that she was free to go and she left. Officers had informed defendant that they were looking for a small boy, and as they drove to the truck, defendant told the officers that when they found the truck, they

would find the body of the boy. With defendant's assistance, police located the truck, and began to search around the truck for the body. Because it was still dark, the officers were unable to find Michael's body, even with the help of a police helicopter. An officer again asked defendant to tell him where the body was located. The officer indicated that if defendant didn't tell them where the body could be found, the officer would ask defendant's sister to return. Defendant then told the officer specifically where the body of the victim was located.

Defendant complains that during this sequence of events his *Miranda* rights were violated. First, he argues that the police did not scrupulously honor his right to cut off questioning. Second, defendant maintains that he should have been re-advised of his *Miranda* rights after his sister told police he would take them to the truck. Finally, defendant argues that his statements indicating the location of the victim's body were a product of coercion.

### 1. Honoring Defendant's Right to Cut Off Questioning

██ The U.S. Supreme Court in *Michigan v. Mosley* held that statements obtained from a person in custody after he has exercised his right to remain silent are not *per se* proscribed by *Miranda*. 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Instead, it held that the critical factor to admissibility is whether the police "scrupulously honored" the person's right to cut off questioning. *Id.*

The facts show that the police gave defendant his *Miranda* warnings, and defendant invoked his right to remain silent by saying "I have nothing to say." The police did not question him any further and put defendant into the back of a police car. We believe the police scrupulously honored defendant's invocation of his right to remain silent.

### 2. Readvising of Miranda Rights

██ After talking to his sister, defendant waived his right to remain silent by

volunteering to tell the officers where they could find the truck. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *State v. James,* 141 Ariz. 141, 685 P.2d 1293 (1984). Defendant contends that irrespective of any waiver, police should have repeated the *Miranda* warnings when he told them he would help them find his truck. We do not agree. When a defendant is given *Miranda* warnings upon arrest "[f]urther warnings are not required in the absence of circumstances between the arrest and interrogation which would alert the officers that the accused may not be fully aware of [his] rights." *State v. Noriega,* 142 Ariz. 474, 480, 690 P.2d 775, 781 (1984). In the instant case, defendant volunteered to take the police to the truck only minutes after he had received his *Miranda* warnings. We believe that defendant was still fully aware of his rights. As we find there was no change of circumstances so as to require additional warnings, the warnings did not need to be repeated. We find no error.

### 3. Coercion

After taking officers to the truck, the appellant was held in custody while the officers undertook an unsuccessful search for Michael's body. At this time it was still dark and even though the body was only 100 yards from the truck, the police were unable to locate the victim. A police officer advised appellant that "if you don't tell us where the boy is, Sergeant Hardyman is going to call your sister back out." At this point, the defendant told them where to find the body.

■ Defendant contends the threat to bring his sister back amounted to coercion and that his resulting statement should have been suppressed. First, we note that the victim's body would have been found as soon as it became light; therefore, the body would have been admissible under the "inevitable discovery doctrine" of *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). Second, while

we might agree that the conduct of the police amounted to coercion, any error in failing to suppress the statement was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Ashelman,* 137 Ariz. 460, 671 P.2d 901 (1983). In the instant case, the evidence against defendant was overwhelming, even without his statement. Joel clearly identified the defendant. Additionally, there was physical evidence that linked defendant to the murder. Thus, even if it was error to admit the statement, we nevertheless believe reversal is not required because the jury would have reached the same verdict without the statement. *Chapman, supra; Ashelman, supra.*

### IDENTIFICATION

Defendant next complains about the out-of-court and in-court photographic identifications made by Joel and Rudy (a boy who was accosted by defendant in a fashion similar to Joel and Michael one day before the instant crimes). Defendant argues that: 1) the photographic lineup given to both Joel and Rudy was unduly suggestive; 2) that publicity tainted Rudy's identification and 3) that the procedures employed by the trial court at the *Dessureault* hearing were erroneous.

### 1. Photographic Lineup

■ Joel and Rudy were given separate photographic lineups. From these lineups, both Joel and Rudy identified the defendant. We have reviewed the photographs and do not find the lineup unduly suggestive. "Lineups need not and usually cannot be ideally constituted. Rather, the law only requires that they depict individuals who basically resemble one another such that the suspect's photograph does not stand out." *State v. Alvarez,* 145 Ariz. 370, 373, 701 P.2d 1178, 1181 (1985) (citations omitted). In the instant case, the photographs resembled each other so that defendant's photograph did not stand out from the other photographs. We find no error.

*2. Publicity*

■ Defendant also contends that pre-lineup publicity tainted Rudy's identification. Defendant accosted Rudy, age 10, on 5 May—the day before Michael and Joel were picked up by the defendant. After defendant was arrested, his picture was shown on television and in the newspaper. When Rudy recognized the defendant as the person who had offered him a job, he told his mother. She told the police. The photographic lineup occurred 11 May. There was then only a few days between the incident and the lineup. The officer who presented the lineup testified Rudy did not seem at all doubtful when he picked out defendant's photograph. Finally, Rudy had a good opportunity to view defendant. Rudy saw defendant in a well-lighted store and conversed with defendant for a few minutes. The test of a witness' identification is reliability based on the totality of the circumstances. In evaluating the likelihood of misidentification, factors to be considered include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*State v. Alvarez,* 145 Ariz. at 372, 701 P.2d at 1180 (quoting *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972)).

Defendant presented no evidence to show how publicity tainted Rudy's identification. Furthermore, the fact that Rudy had seen the defendant on television and in the newspapers prior to the lineup does not on its own sufficiently taint the identification or otherwise indicate unreliability. Based upon a totality of the circumstances, we believe the identification by Rudy was reliable and credible. We find no error.

*3. Dessureault Hearing*

■ Finally, defendant contests the procedures employed during the *Dessureault* hearing as it applies to Joel. *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), provides that when an identification is challenged, the judge must hold a hearing in the absence of the jury to determine whether it is tainted by unduly suggestive circumstances and should be suppressed.

At the *Dessureault* hearing, Joel identified defendant from a photographic lineup. An officer testified about the photographic lineup procedure as it applied to Joel. The trial court, however, failed to rule on the motion to suppress at the conclusion of the *Dessureault* hearing. At the beginning of the trial, on 11 October 1984, Joel was sworn in before the jury. He was again asked to look at a photographic lineup [1] and he identified in court the photograph of defendant. Later during a break, the trial judge asked counsel if he had ruled on the motion to suppress at the *Dessureault* hearing. Defense counsel responded that he did not think the judge had ruled; whereupon, the judge said:

> THE COURT: Why don't you show based on the testimony as to the out of court identification by the witness—
>
> MR. RAMAGE–WHITE: Joel
>
> ———————
>
> THE COURT: —Joel _____, the Court finds the out of court identification was not suggestive, nor were there any suggestions made as to the officer as to who to identify.
>
> So the motion to suppress the out of court identification is denied.
>
> The Court inadvertently forgot to make that as a part of the record at the time (defense counsel) made his motion.

**1.** Defendant was not physically present in the courtroom during Joel's testimony because it was believed that the experience of testifying before the defendant would be psychologically traumatic for Joel. Although defendant was not physically present, he could hear and see the proceedings within the courtroom by way of a window in "defendant's box" which contained a telephone to his counsel.

Defendant argues that the trial court erred in allowing Joel to testify in front of the jury about the identification of the defendant before ruling on the motion to suppress. We agree that the trial court should have ruled on the motion to suppress before allowing the witness to testify before the jury.

We believe, however, that this was a mere oversight on the part of the court and that the later ruling accurately reflected the findings the trial court would have made at the pre-trial *Dessureault* hearing. These findings are supported by the evidence. Joel was with defendant for approximately six hours, and had ample opportunity to view him. Additionally, the length of time between the crime and the photographic lineup was minimal, and Joel was very certain in his identification of defendant. We find no error.

## CONSENT TO SEARCH DEFENDANT'S BUSINESS

Defendant's business was searched by the police. The search revealed the layout of the rooms as Joel had described and furnishings including a blanket containing semen. The search then corroborated Joel's description of the place defendant had taken the two boys. Defendant contends that the search of his business was unlawful because there was no warrant and as a result, evidence from the search should have been suppressed. Specifically, defendant argues that his sister, who consented to the search, lacked the authority necessary to consent to the search.

Defendant and his sister were by their own admission and as indicated by the "Business Privilege License" hanging on the wall co-owners of the business. An officer specifically asked defendant's sister whether there were any rooms of the business that were private to either co-owner. Defendant's sister responded that none of the three rooms of the business was for the exclusive or private use of either of them. Defendant's sister then gave the officers permission to search the premises.

Generally, a warrantless search is *per se* unreasonable unless it is within one of the specified exceptions; among these exceptions is the situation where a third party validly consents to the search. *State v. McGann*, 132 Ariz. 296, 300, 645 P.2d 811, 815 (1982). "A third party validly consents to the search of a defendant's premises or property when: (1) the consent is voluntarily given; and (2) the third party has 'common authority over or other sufficient relationship to the premises' or property searched or seized." *Id.* (quoting *U.S. v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974)).

Defendant's arguments focus on the meaning of common authority, rather than on the voluntariness of the consent, which is not contested. For common authority to exist, more than a mere property interest of the third party must be shown. *U.S. v. Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The test for determining common authority or other sufficient relationship focuses on apparent authority rather than actual authority. *State v. Girdler*, 138 Ariz. 482, 486, 675 P.2d 1301, 1305, *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 826 (1984). Thus, if it reasonably appeared that a third party had common authority over the premises, then the consent to search would be valid. *Id.*

We believe that it reasonably appeared to the officer that defendant's sister had common authority over the business premises. She stated she was part owner. Her name, along with defendant's was on the business license on the wall. This, in addition to her voluntary consent, rendered the search valid. The motion to suppress evidence from the search was properly denied.

## PRIOR BAD ACTS

As noted above, the day before the murder, Rudy, age 10, encountered defendant at a grocery store. Defendant asked Rudy if he and a buddy would like to earn some money doing yardwork. Rudy, who was alone at the time, told defendant he would have to ask his mother for permission. De-

fendant then offered Rudy a ride to his house. Rudy declined the offer and walked home. Defendant followed Rudy in his car. Rudy's mother told him he could not work for strangers, but when Rudy left his house to tell defendant, defendant was already gone. Before trial, defendant moved to preclude Rudy's testimony under Rule 404(b), Ariz.R.Evid., 17A A.R.S.. The motion was denied.

Defendant contends it was error to allow Rudy's testimony into evidence. Specifically, he argues that 1) the incident is not within Rule 404(b) because the incident did not involve criminality; 2) the incident was introduced solely to show defendant is a bad person; and 3) that there is no similarity between the instant crimes and the incident involving Rudy.

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

### 1. Criminality

 The Rules of Evidence were adopted by this court in 1977. Like many of the Rules of Evidence, Rule 404(b) was based on previous case law. *James v. State*, 53 Ariz. 42, 84 P.2d 1081 (1938); *Lawrence v. State*, 29 Ariz. 247, 240 P. 863, *cert. denied*, 269 U.S. 585, 46 S.Ct. 201, 70 L.Ed. 425 (1925); *Crowell v. State*, 15 Ariz. 66, 136 P. 279 (1913). The question of whether the present rule involves only acts of criminality was addressed in *State v. Francis*, 91 Ariz. 219, 371 P.2d 97 (1962). The facts of *Francis* are very similar to those of the instant case. In that case, a sixteen year old victim was looking for her younger brother at about nine o'clock at night. A man in a car stopped her and showed her a badge, telling her he was a juvenile officer. He told her it was after curfew. She explained, however, that she

was looking for her brother. The man offered to help her look for him, and so she got into his car. While in the car, he told her he was taking her to a juvenile home to check her records even though she insisted she had never been in trouble. Instead, he took her out onto a dirt road and forcibly raped her.

At trial, the State called another girl, Norma, to testify that about ten o'clock in the morning, on the same day, defendant stopped her. He likewise showed her a badge, and asked her whether she had been in a juvenile home, and several other personal questions. Defendant asked her to go with him, but she refused. Norma reported the incident and his license number to police. Norma identified defendant at a lineup and also at trial.

In *Francis*, defendant filed notice of alibi, thereby making identity an issue. The State introduced Norma's testimony to show plan or scheme by which defendant could be identified. The defendant argued that the act involving Norma lacked criminality. The court stated:

Defendant also contends that any past conduct on the part of the defendant must in fact have been criminal or tend directly to prove the defendant guilty of the particular crime with which he is charged or else it does not fall within one of the exceptions to the general rule. He cites *People v. Byrnes*, 27 Cal.App. 79, 148 P. 944 (1915) in support of such proposition.

However, where the identity of the defendant is the question in issue, any fact which tends to establish the identity has probative value and if offered for that purpose it is receivable. Other acts or crimes may be shown if they are relevant, regardless of their criminal character. *James v. State, supra; State v. Lawrence, supra.* See also I Wigmore, Evidence, 3rd ed. § 216. But see *State v. Bassett*, 26 N.M. 476, 194 P. 867 (1921).

*State v. Francis*, 91 Ariz. at 221–222, 371 P.2d at 98–99.

In the instant case, the acts of defendant in asking Rudy about making some money did not have to be criminal in nature to be admissible under Rule 404(b). We find no error.

## 2. Defendant is a Bad Person

The purpose of Rule 404(b) is to prevent introduction of evidence solely to prove a defendant's propensity for crime or to show defendant is a bad person. The rule, nevertheless, recognizes that some evidence is admissible to show intent, motive, opportunity, preparation, plan, knowledge, identity or absence of mistake or accident.

Defendant presented the defense of "character trait of impulsivity." This defense is really a denial of premeditation. Since intent was a material issue, we believe the prior act was properly admitted to show a common scheme or plan indicative of defendant's intent and negating the defense of "character trait of impulsivity." We find no error.

## 3. Similarity

██ Defendant contends that there was no connection or similarity between the two incidents. We do not agree. Both incidents occurred in the morning. Both incidents involved young boys. In both incidents, defendant used the same "line"—he asked them if they would like to make some money doing yardwork. In both instances, the boys were to be taken to the "yardwork" in defendant's truck. Finally, both incidents occurred close to defendant's business. We believe there is considerable connection or similarity between the two events.

We find no error.

## GRUESOME PHOTOGRAPHS

Defendant argues that the trial court abused its discretion in admitting certain photographs because they were more prejudicial than probative. Particularly, he contends that ten photographs, exhibits 9–18, served no purpose other than to inflame the jury, especially since the subject-matter of the photographs could be described with words.

██ While it may be true that the subject-matter of a photograph can be described adequately with words, that is not the test of admissibility.

[T]he correct rule is that exhibits which may tend to inflame the jury must first be found relevant. The trial court must then consider the probative value of the exhibits and determine whether it outweighs the danger of prejudice. In making this determination, the trial court must examine the purpose of the offer.

*State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983) (citations omitted). We have identified several permissible purposes: to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed. *State v. Thomas*, 110 Ariz. 120, 130, 515 P.2d 865, 875 (1973).

██ In the instant case, exhibits 17 and 18 show the victim's foot which has bruises and some splattered blood on it. Exhibits 15 and 16 show minor cuts to the victim's hands. Exhibits 13 and 14 show a small cut on the victim's scalp. Exhibit 12 shows the victim's arm with a cut on it, and exhibit 10 shows blood stains on the trunk of a tree. Exhibits 9 and 11 defendant contends are the most gruesome. Exhibit 11 shows four puncture, stab wounds in the victim's chest. This photograph, however, does not show any blood because the photograph was taken after the body had been cleaned. Exhibit 9, taken at the murder scene, shows the victim's nude body lying huddled on the ground under a tree. There is blood smeared all over the body; however, no wounds can be seen in this photograph.

We believe that none of these photographs is particularly gruesome. The state's theory of the homicide was that the murder was not the product of an impul-

sive act but was instead premeditated. The photographs were useful in explaining the pathologist's testimony, in corroborating Joel's testimony, and in corroborating the state's theory of the homicide. We do not find that the trial court abused its discretion by admitting the photographs.

## PRIOR CONVICTIONS

■ Immediately after the jury returned its verdicts, the court turned to the question of defendant's prior convictions. Defendant admitted having prior convictions of aggravated assault, assault with intent to commit rape, assault with a deadly weapon, armed burglary, and lewd and lascivious acts. *See State v. Castaneda,* 111 Ariz. 264, 528 P.2d 608 (1974), regarding some of these priors. The prior convictions were used to aggravate defendant's sentences and particularly the death sentence. *See* A.R.S. § 13–703(F)(1) & (2).

On appeal, defendant claims that there was no factual basis to show that defendant was competent to plead guilty to the prior convictions. Defendant maintains that since there was ample evidence that he was not competent to waive his constitutional rights, the court should have made a finding that defendant was competent before accepting his plea. Defendant urges that failure to do so denied him due process of law and requires a reversal of his sentences. We do not agree.

The court had before it the opinions of two experts. Dr. Martin Blinder, the psychiatrist for the defense, stated that being a sexual psychopath is a personality disorder as opposed to a mental illness. Dr. Otto Bendheim, the psychiatrist for the state, concluded that appellant was not suffering from a recognized, treatable mental illness that would render him incompetent. Also, Dr. Bendheim, after examining appellant concluded that appellant had the ability, if he chose, to plead guilty because he: 1) had the capacity to make a decision concerning the waiver of his rights; 2) was fully aware of the meaning and possible consequences of entering a guilty plea; and 3) was fully aware of his constitutional

rights as formulated in his *Miranda* warnings. The testimony before the court indicated that defendant was competent to plead guilty to the prior offense.

■ Defendant contends, however, that he was not told that his admission would be used to support the imposition of the death penalty. At the hearing on defendant's prior convictions, the trial judge told defendant of the range of possible sentences for the counts other than on the first degree murder charge. The trial judge then said:

THE COURT: All right.

Is it also your understanding that you've been convicted of first degree murder and one of the aggravating, statutory aggravating factors that I can consider at the time of sentencing in this case is that you have these prior convictions and that they involve the use of a dangerous instrument or deadly weapon during the course of their commission?

Do you understand that?

MR. CASTANEDA: I understand.

THE COURT: Do you still want to go ahead and admit the prior convictions?

MR. CASTANEDA: Yes.

While the judge did not clearly state that the admission could result in the imposition of the death penalty, we believe that implication is clear from the record and was clear to defendant. The record indicates that during the trial the judge had discussed the death penalty in defendant's presence. Defendant was aware of the range of sentences. It would be most difficult for us to believe that defendant did not know the death penalty was involved.

## DEATH SENTENCE

Defendant contends on various grounds that the death sentence was erroneously imposed. He contends that the trial judge erred (1) in allowing his admission of prior convictions; (2) in the finding that the crime was cruel, heinous, and depraved, under A.R.S. § 13–703(F)(6); (3) in making findings outside the scope of A.R.S. § 13–703(F)(6) and that these extra findings ren-

dered defendant's sentence cruel and unusual; (4) that A.R.S. § 13–703(F)(6) is unconstitutionally broad and vague; and (5) that the trial judge should have found more mitigating circumstances.

First, we have already addressed the constitutional propriety of allowing defendant to admit prior convictions. *See supra* at 18. We find that the procedures required by our rules and the United States and Arizona Constitutions have been met in the instant case.

■ Second, defendant argues that the record does not support a finding of cruel, heinous or depraved. Since we have held that these terms are in the disjunctive, we need only find the presence of one of these terms to uphold the aggravating circumstance of A.R.S. § 13–703(F)(6). *See State v. Correll*, 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986).

We believe the murder was committed in a cruel manner. We have defined cruelty as involving the infliction of pain, especially in a wanton, insensitive or vindictive manner. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). Hence, whether the murder involved cruelty is a question that focuses on the victim and his feelings before he died. "Cruelty can involve mental as well as physical suffering. A victim's uncertainty as to the ultimate fate can be significant in indicating mental suffering." *State v. Correll*, 148 Ariz. at 480, 715 P.2d at 733.

Here, the victim, after being abused at defendant's shop, was taken to a desert area and forced to remove all of his clothes and walk approximately 100 yards across the desert in his bare feet. Joel's testimony indicates that, as Michael stood naked and vulnerable before defendant, Michael realized defendant intended to kill him. Joel testified that Michael begged not to be killed. We believe this evidence clearly shows that Michael suffered considerable anguish before he died.

Additionally, we find that Michael suffered physically as well. Defendant stabbed Michael in the chest four times.

Testimony from a pathologist indicated it may have taken Michael as long as five minutes to die. Evidence also indicated that he died in writhing pain while lying on a red ant hill. We believe that defendant caused Michael to undergo both great physical and mental suffering. The trial court was correct in finding that the murder was committed in a cruel manner.

■ Third, defendant also contends the trial judge made findings outside the scope of A.R.S. § 13–703(F)(6) by finding additional aggravating circumstances and that these extra findings rendered defendant's death sentence cruel and unusual. The trial judge found:

Number three, the defendant committed the offenses in an especially heinous, cruel or depraved manner, A, in that the deceased victim was held and terrorized over a period of several hours; and, B, this deceased victim was killed while begging for his life.

Number four, that the victim suffered severe mental anguish throughout the course of the offenses prior to his death.

Five, the Court further finds that the victim was of a young age, slight build, and at the mercy of the defendant with no reasonable opportunity to defend himself.

As noted above, Finding Number Three is supported by the facts. Defendant, however, contends that the court erred in making Findings Four and Five. We agree.

A.R.S. § 13–703(D) provides "The court shall return a special verdict setting forth its findings as to the existence or non-existence of each of the circumstances set forth in subsection F of this section and as to the existence of any of the circumstances included in subsection G of this section." Section F lists the aggravating circumstances that the court may find and Section G lists some mitigating circumstances though the court is not limited to those listed but must set forth any mitigating factor which might call for leniency. *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

It would appear that Findings Number Four and Five were intended to be part of Number Three supporting the conclusion that the offense was committed in an especially heinous, cruel or depraved manner. Still the statute does not allow as a separate aggravating circumstance those not specifically provided for in Section F. We therefore strike findings Number Four and Five.

Since we have stricken Findings Four and Five, we need not consider defendant's contention that these extra findings rendered the sentence cruel and unusual.

■ Fourth, we have reviewed the constitutionality of A.R.S. § 13–703(F)(6) pursuant to defendant's request. We continue to uphold its validity. *See State v. Ortiz,* 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982).

Fifth, we address defendant's contentions on mitigating circumstances. He specifically alleges that the trial judge should have found that defendant committed the murder while under duress, A.R.S. § 13–703(G)(2), and while his capacity to appreciate the wrongfulness of his conduct or to conform to the requirements of law was impaired, A.R.S. § 13–703(G)(1). The trial judge made the following findings in mitigation:

> The Court finds no mitigating circumstances as set forth in A.R.S. 13–703 as amended, subsection G, paragraphs one through five. The Court has considered the mitigating circumstances as set forth in the letters addressed to the Court and made a part of this record. And the Court has further considered the defendant's record of good behavior while incarcerated, and the social and family history of the defendant. The Court has further considered the mental disorder which you are suffering from. The Court further finds as mitigating circumstance the defendant's admission of guilt for the offenses and expression of remorse.

> The Court finds that the mitigating circumstances are not sufficiently mitigating to outweigh the aggravating factors

found by this Court beyond a reasonable doubt. The statute requires that the Court shall impose a sentence of death if the court finds one or more aggravating circumstances and finds no mitigating circumstances sufficiently substantial to call for leniency.

■ A.R.S. § 13–703(G)(2) specifically provides that the trial judge may consider, in mitigation of defendant's sentence, whether he was "under unusual and substantial duress, although not such as to constitute a defense to prosecution." Duress is defined as consisting of "any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." Black's Law Dictionary 452 (5th ed. 1979). The clear import of this definition is that one person must coerce or induce another person to do something against his will. Defendant argues, however, that his personality disorder and impulse control problems amounted to duress. We do not agree that such a mental condition can fall within the meaning of duress. The mitigating factor of A.R.S. § 13–703(G)(2) is not present in the instant case.

■ We also believe that the mitigating circumstance of A.R.S. § 13–703(G)(1) is not supported by the evidence. A.R.S. § 13–703(G)(1) provides that the trial judge may consider in mitigation whether "defendant's capacity to appreciate the wrongfulness of his conduct or to conform to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

In this case, the record is clear that the trial judge considered defendant's mental disorder. He found that the aggravating circumstances were not sufficiently outweighed by the disorder or by other evidence presented in mitigation. We have reviewed the record and agree with the trial judge. Both Blinder and Bendheim concluded in reports found in the presen-

tence materials that defendant knew the difference between right and wrong and was not suffering from an inability to control his impulses at the time of the offense.

■ We therefore uphold the finding of three aggravating circumstances: 1) defendant has been convicted of another offense for which life imprisonment or death was imposable, A.R.S. § 13–703(F)(1); 2) defendant was convicted of a felony involving the use or threat of violence on another person, A.R.S. § 13–703(F)(2); and 3) defendant committed the murder in an especially cruel, heinous or depraved manner, A.R.S. § 13–703(F)(6). We agree with the trial court that there are no mitigating circumstances sufficiently substantial to call for leniency.

This, however, does not end our inquiry.

In each death penalty case we conduct an "independent review of the facts that establish the presence or absence of aggravating and mitigating circumstances[,]" and then "determine for ourselves if the latter outweigh the former when we find both to be present." *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976) (citations omitted), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1976).

*State v. (Robert Douglas) Smith,* 138 Ariz. 79, 85, 673 P.2d 17, 23 (1983), *cert. denied,* 465 U.S. 1074, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984). We have independently reviewed the record and the aggravating and mitigating circumstances in this case and find that the mitigating circumstances are not sufficiently substantial to call for leniency. The crime, which was shockingly brutal and cruel, would call for far more in the way of mitigating circumstances than appear from this record before we could consider leniency. We believe the death penalty was properly imposed in this case.

PROPORTIONALITY REVIEW

■ In cases where the death penalty is imposed we

also conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate

to the penalty imposed in similar cases, considering both the crime and the defendants." *State v. Richmond,* supra, 114 Ariz. at 196, 560 P.2d at 51.

*State v. (Robert Douglas) Smith,* 138 Ariz. at 86, 673 P.2d at 24. In doing so, we must then determine "whether the sentences of death are excessive or disproportionate to the penalty imposed by this court in similar cases ...." *State v. Bracy,* 145 Ariz. 520, 538, 703 P.2d 464, 482 (1985) (quoting *State v. Nash,* 143 Ariz. 392, 406, 694 P.2d 222, 236, *cert. denied,* —— U.S. ——, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985)).

A similar case is *State v. Roscoe,* 145 Ariz. 212, 700 P.2d 1312 (1984), where defendant abducted, sexually assaulted, and strangled a helpless seven year old girl. This court found that the murder was committed in a cruel, heinous, and depraved manner and that the death penalty was properly imposed. *Id.* at 226–227, 700 P.2d at 1326–1327. We have also considered the following similar cases in which we found the death penalty properly imposed: *State v. Clabourne,* 142 Ariz. 335, 690 P.2d 54 (1984); *State v. Gillies,* 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *State v. Summerlin,* 138 Ariz. 426, 675 P.2d 686 (1983); *State v. (Robert Douglas) Smith, supra.* In each of these cases the defendant both sexually assaulted and murdered the victim, and properly received the death penalty based on one or more of the aggravating circumstances found in this case.

Additionally, we have considered cases where the death penalty was reduced to life imprisonment. *See State v. Johnson,* 147 Ariz. 395, 710 P.2d 1050 (1985) (defendant did not create grave risk of danger to others or commit murder in cruel, heinous, or depraved manner, and no aggravating circumstances); *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983); *State v. Graham,* 135 Ariz. 209, 660 P.2d 460 (1983) (substantial mental impairment due to drug addiction, neurological problems and brain damage; vulnerability to influence; lack of prior record of violence); *State v. Valen-*

*cia,* 132 Ariz. 248, 645 P.2d 239 (1982) (youth of defendant); *State v. Watson,* 129 Ariz. 60, 628 P.2d 943 (1981) (change of character and goals while in prison; youth of defendant; murder occurred as a result of shootout begun by victim); *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979) (substantial mental impairment due to brain lesion). The facts in the instant case are not similar to these cases where we reduced the penalty from death to life imprisonment.

Based on our review of other decisions of this court, we believe that the circumstances of this murder indicate that it is above the norm of first degree murders and that defendant is above the norm of first degree murderers. *See State v. Blazak,* 131 Ariz. 598, 643 P.2d 694, *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). Therefore, we find that imposition of the death penalty is proportional to the penalties imposed in similar cases.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant alleges that his trial counsel was ineffective. First, he argues that his counsel should not have pursued the insanity defense because the defense psychiatrist was unable to provide testimony necessary to establish an insanity defense, and when the insanity defense failed, defendant's prior crimes and bad acts, which his counsel had raised to show impulsivity, were left on the record to defendant's prejudice. Second, he contends that his trial counsel "made no effort to establish a record regarding the potential for prejudice that resulted from Rudy's repeated observation and consideration of television and newspaper coverage which highlighted the appellant as a suspect." Finally, he urges that his counsel took a "minimalist approach" in the defense.

■ At the outset, we note that in determining whether trial counsel was so ineffective as to warrant a new trial, we apply a two-pronged test: 1) was counsel's performance deficient? *State v. Nash,* 143 Ariz. 392, 694 P.2d 222 (1985); and 2) was

defendant prejudiced by his attorney's deficient performance? *State v. Lee,* 142 Ariz. 210, 689 P.2d 153 (1984). This test comports with the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under the *Strickland* test, *supra,* we must determine whether defense counsel's performance was reasonable under prevailing professional norms considering all the surrounding circumstances without the distorting effects of hindsight. *Id.* at 688–689, 104 S.Ct. at 2065. This objective standard allows courts to consult various sources, such as American Bar Association Standards; A.B.A. Standards for Criminal Justice, 2d ed. (1980); however, such sources will be used merely as guides to prevailing professional norms. *State v. Nash,* 143 Ariz. at 397, 694 P.2d at 227.

As to prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. In other words, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. at 2069.

### 1. Insanity Defense

■ Defendant's first allegation is that it was ineffective assistance of counsel to mount an insanity defense. Defendant pursued four defenses: 1) *M'Naghten* insanity, 2) presumption of innocence, 3) "failure of State to prove all elements", and 4) character trait of impulsivity, which is the defense of lack of premeditation. Evidence from the record indicates that no other defenses were available to defendant. Defendant was clearly identified by the surviving victim. Physical evidence also strongly supported the conclusion that defendant committed the charged crimes. The defenses of insanity and impulsivity

appeared to be the defendant's only hope if the defendant was to avoid the death penalty. The question before us is whether it was unreasonable to mount the defenses of insanity given the surrounding circumstances and prevailing professional norms.

An evaluation of defendant was made before trial by Dr. Blinder. At the trial, Dr. Blinder testified on cross-examination by the state, "On the basis of my psychiatric examination and the other evidence of use, it is my opinion that Mr. Castaneda was free of any mental disorder which would have significantly compromised his ability to know the nature, quality, and wrongfulness of his acts." Defense counsel should have known that pursuit of the insanity defense would probably be unsuccessful, at least with this psychiatrist.

We do not find, however, that pursuit of this defense prejudiced the defendant. Much of the evidence defense counsel put before the jury was intended to show both insanity and impulsivity. Defense counsel introduced some prior bad acts to substantiate the psychiatrist's testimony on defendant's impulse control problems. Defense counsel also argued to the jury in closing that these acts, coupled with the psychiatrist's testimony, indicated defendant did not kill with premeditation. This evidence was introduced to prove a viable defense theory, namely impulsivity. Defense counsel abandoned the insanity defense once it became clear the psychiatric testimony could not support the theory. In closing, defense counsel stated:

> When I first spoke to you, I told you that our defense would be insanity and that the[re] would be character trait for impulsivity. When it became evident even from my imported psychiatrist that insanity was not a defense, I properly abandoned it and I'm not going to insult you by asserting it. On the other hand, I think there is abundant evidence of a character trait for impulsivity in Mr. Castaneda.

Admittedly, from hindsight, this might have been handled differently. Even though the insanity defense was weak and

later had to be abandoned, it was not unreasonable that the defense counsel pursued this defense especially when evidence to support the defense could also be used in the "character trait for impulsivity" defense. We do not believe that counsel was inadequate in pursuing this defense.

### 2. Prejudice

██ Next, we turn to defendant's allegation that counsel did not show possible prejudice resulting from Rudy's pre-lineup identification. Defendant contends that counsel should have shown that the television and newspaper publicity, which shows pictures of the defendant, tainted the lineup identification. We do not agree.

We believe counsel performed competently at the *Dessureault* hearing on Rudy's identification and at trial in the cross-examination of Rudy. Even if counsel did not indicate that Rudy's identification could have been tainted by publicity, we nevertheless believe that the outcome would have been the same. Physical evidence and Joel's identification clearly indicated defendant committed the crime. Thus, even if we assume it was deficient performance, defendant was not prejudiced.

### 3. Minimalist Approach

██ Finally, we address the allegation that defense counsel took a "minimalist approach". In support of this argument, defendant alleges that his counsel made an avowal as to the state of the evidence, did not supplement an oral motion with a written argument, and would not have pursued certain motions without the state's insistence. We believe defense counsel performed competently and reasonably in this context. Defense counsel made numerous pretrial motions supported by written and oral arguments. Moreover, it is not deficient performance to fail to provide a written memorandum on a motion in limine, although providing written memoranda is clearly a preferable practice. Finally, we do not believe that it was deficient performance given prevailing professional

norms to make an avowal on the state of the evidence. Stipulations concerning evidence are often made in criminal cases.

In conclusion, we do not believe defendant was prejudiced by counsel's representation. Considering the overwhelming evidence of guilt, defendant's counsel did the best he could with what he had. That the defense counsel was not successful can be attributed more to the facts of the case than to the alleged incompetency of counsel. We find no error.

We have also searched the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. McGann*, 132 Ariz. 296, 645 P.2d 811 (1982). We find none.

Affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.