IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

ANTHONY LITO HERNANDEZ,
*Appellant,*

No. CR-17-0325-PR
Filed May 18, 2018

Appeal from the Superior Court in Cochise County
The Honorable James L. Conlogue, Judge
No. CR-201400529
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
**VACATED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Amy M. Thorson (argued), Assistant Attorney General, Criminal Appeals Section, Tucson, Attorneys for State of Arizona

John William Lovell, John William Lovell Esq., Tucson; and David J. Euchner (argued), Pima County Public Defender's Office, Tucson, Attorneys for Anthony Lito Hernandez

Timothy Sandefur, James Manley, Goldwater Institute, Phoenix, Attorneys for Amici Curiae Goldwater Institute and Professor Erik Luna

Maricopa County Public Defender, Amy Kalman (argued), Deputy Public Defender, Phoenix; and Timothy J. Eckstein, Osborn Maledon PA, Phoenix, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL, TIMMER, BOLICK, and GOULD joined. JUSTICE BOLICK concurred.

_____

JUSTICE LOPEZ, opinion of the Court:

¶1        We consider whether law enforcement officers violated a defendant's rights under the Fourth Amendment to the United States Constitution and article 2, section 8 of the Arizona Constitution when they followed the defendant's vehicle onto a private driveway to complete a traffic stop which began on a public road. We hold that the defendant's rights were not violated.

**BACKGROUND**

¶2        On the night of September 11, 2014, two Cochise County Sheriff's Deputies on patrol in Willcox began following a vehicle after observing it turn at several intersections in an apparent effort to elude the officers. While following the vehicle, the officers ran a license plate check, which indicated that the vehicle's insurance had been cancelled the previous month.

¶3        The officers turned on their emergency lights to initiate a traffic stop for the insurance cancellation and, seconds later, the vehicle drove onto the shoulder of the road, ran over a curb as it maneuvered onto a private driveway, and led officers along the length of the driveway and into the backyard area of a residence. The officers did not know if the vehicle's driver had a connection to the property, but one officer stated that he followed the vehicle "because that's where the vehicle took us when we attempted to stop it." One of the officers testified that he did not perceive any immediate danger to himself or the public, but the other officer testified that he thought it necessary to contact the driver because his actions posed a potential danger to the public.

¶4        The driver, Anthony Lito Hernandez, stopped the vehicle, opened the door, and began to step out. An officer told Hernandez to remain inside the vehicle. On approaching the vehicle, the officer smelled

marijuana and ordered Hernandez to get out and place his hands behind his back.  During a pat-down search, the officer found $2,446 in cash and an empty plastic baggie.  Inside the vehicle, the officers found a burned marijuana cigarette, a metal spoon with char marks on the bottom and "a burnt substance in it," and a clear plastic baggie containing suspected methamphetamine.  Hernandez told the officer he did not know the property owner, but the home was later determined to be occupied by his girlfriend.

¶5        Hernandez was indicted for possession of marijuana, possession of drug paraphernalia, and transporting methamphetamine for sale.  After the trial court denied his motion to suppress the evidence seized from him and his vehicle, a jury found Hernandez guilty of those offenses.

¶6        In a divided opinion, the court of appeals affirmed, stating that "[a] police officer in continuous vehicular pursuit of a person under investigation for a violation of the law cannot be arbitrarily stopped by the person's entry onto private property," and that "[a]ny contrary rule would encourage flight to avoid apprehension." *State v. Hernandez*, 242 Ariz. 568, 576 ¶ 27 (App. 2017).  The dissent concluded that the officers' encroachment "upon constitutionally protected curtilage," without a warrant, was per se unreasonable, as the State had failed to show exigent circumstances. *Id.* at 581 ¶ 49.

¶7        We granted review because the case presents a recurring issue of statewide importance.  We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## DISCUSSION

¶8        This Court "review[s] for abuse of discretion the trial court's factual findings on the motion to suppress, but review[s] de novo the trial court's ultimate legal determination that the search complied with the Fourth Amendment." *State v. Gilstrap*, 235 Ariz. 296, 297 ¶ 6 (2014).  "We view the facts in the light most favorable to support the trial court's ruling on [a] motion to suppress." *State v. Cook*, 115 Ariz. 188, 192 (1977).

¶9        Hernandez argues that the officers' warrantless entry into the area of his girlfriend's property where the driveway met the backyard violated his rights under the Fourth Amendment to the United States

Constitution.[1]   Under the Fourth Amendment, law enforcement officers generally must obtain a warrant to enter a protected area to make an arrest. *See Payton v. New York*, 445 U.S. 573, 576 (1980).   However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  For example, no warrant is required when a person consents to an officer's entry or exigent circumstances justify the intrusion.  *Payton*, 445 U.S. at 583.

¶10        As a preliminary matter, Hernandez contends that we should not address the consent and exigent circumstances issues because the State did not raise them in the trial court.  We disagree.  Although "[w]e do not ordinarily consider issues not raised in the trial court or court of appeals," if "good reason exists, this court may and will entertain such questions" as the "rule is jurisprudential rather than substantive."  *Jimenez v. Sears, Roebuck & Co.*, 183 Ariz. 399, 406 n.9 (1995).  Good reason exists to address the identified issues because they were decided by the trial court and the court of appeals, the parties submitted post-argument briefs addressing the consent issue at our request, and we will "affirm the trial court's ruling if the result was legally correct for any reason."  *State v. Carlson*, 237 Ariz. 381, 387 ¶ 7 (2015) (quoting *State v. Perez*, 141 Ariz. 459, 464 (1984)).

## I.       Reasonable Expectation of Privacy

¶11        Fourth Amendment protections apply to government intrusions that involve a common law trespass, *United States v. Jones*, 565 U.S. 400, 407–10 (2012), or areas in which an individual has a reasonable expectation of privacy, *Katz v. United States*, 389 U.S. 347, 360 (1967). Because Hernandez does not contend the officers committed a trespass as to him, the issue is whether he had a reasonable expectation of privacy in the driveway and its confluence with the backyard of his girlfriend's home. An expectation of privacy generally extends to the curtilage of a home, or "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" because it is considered part of

---

[1]  Hernandez also argues that his rights were violated under article 2, section 8 of the Arizona Constitution.  As discussed in ¶ 23 *infra*, the Arizona Constitution does not command a different result here.

the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

**¶12**        Hernandez claimed that he did not reside at the residence, but that he spent the night there frequently. The State does not contest his claim on appeal. "[A]n overnight guest has a legitimate expectation of privacy in his host's home." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990); *see also Georgia v. Randolph*, 547 U.S. 103, 113 (2006); *State v. Peoples*, 240 Ariz. 244, 249 ¶ 18 (2016). Thus, if the driveway and its confluence with the backyard constitute curtilage, then Hernandez, as an overnight guest, had a reasonable expectation of privacy in it.

**¶13**        The court of appeals accepted the trial court's analysis that Hernandez's vehicle came to rest on the curtilage of his girlfriend's home but, citing *State v. Cobb*, 115 Ariz. 484, 489 (1977), questioned whether the driveway, as "only a semiprivate area," qualified for the full protection afforded curtilage. *Hernandez*, 242 Ariz. at 572 ¶ 12. In *Cobb*, an officer visited the defendant's home to investigate a recent neighborhood robbery and, after speaking with him, discovered a stolen brooch on the driveway. 115 Ariz. at 486–87. The defendant moved to suppress evidence of the brooch because the officer's seizure of it on the driveway, within the curtilage of his home, violated the Fourth Amendment. *Id.* at 488. This Court held that the officer properly seized the brooch, noting that the defendant consented to his presence on the property and that "[a] driveway is only a semiprivate area" in which the expectation of privacy is contingent "upon the nature of the activities and the degree of visibility from the street." *Id.* at 489 (quoting *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975)).

**¶14**        The court of appeals misread *Cobb* to the extent it inferred that an entire driveway is *always* semi-private and, as such, never warrants an expectation of privacy equivalent to the home. *See Hernandez*, 242 Ariz. at 572 ¶ 12. *Cobb* does not announce a categorical rule, but rather clarifies that "[t]he test . . . should be that of reasonableness, both of the possessor's expectations of privacy and of the officers' reasons for being on that driveway." 115 Ariz. at 489 (quoting *Magana*, 512 F.2d at 1171).

**¶15**        Under these circumstances, where the officers contacted Hernandez on the driveway's confluence with the back of the home which was at least partially obscured from public view, we hold that Hernandez

held a reasonable expectation of privacy. But, even if an individual has a reasonable expectation of privacy in a protected area, the warrant requirement does not apply if the person consents to an officer's entry.

## II. Consent

¶16 We conclude that the officers did not impermissibly invade Hernandez's reasonable expectation of privacy in the curtilage of his girlfriend's home because he impliedly consented to the officers' entry to complete the traffic stop.

¶17 "[C]onsent to a search need not be express but may be fairly inferred from context." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016). During a traffic stop, officers typically follow the pursued vehicle until it stops. Once officers initiate a traffic stop, the driver of the pursued vehicle does not have a legal right to fail or refuse to stop. *See* A.R.S. § 28-1595(A) ("The operator of a motor vehicle who knowingly fails or refuses to bring the operator's motor vehicle to a stop after being given a visual or audible signal or instruction by a peace officer . . . is guilty of a class 2 misdemeanor."). Although the driver's acquiescence to the stop, which is compelled by law, may not indicate consent to the stop itself, the driver's choice to lead the officers to a specific location for the stop constitutes the driver's implied consent to the officer's presence at that location. *Cf. Brown v. McClennen*, 239 Ariz. 521, 522 ¶ 1 (2016) (noting that "[c]onsent cannot be given 'freely and voluntarily' if the subject of a search merely acquiesces to a claim of lawful authority" (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968))). Accordingly, police may reasonably assume that if a pursued driver, in acquiescence to a traffic stop, turns into a private driveway, the driver unequivocally communicates consent through his conduct in causing the stop's occurrence on the property. *See State v. Tucker*, 118 Ariz. 76, 79 (1978) (noting that "the constitutional protection against unreasonable searches demands a waiver by unequivocal words or conduct expressing consent").

¶18 Because Hernandez, like any motorist, does not have a legal right to refuse to comply with an officer's attempt to conduct a traffic stop, he had only two lawful options: stop his vehicle on the public road (and protect the privacy of the curtilage) or, as he did, stop his vehicle in his girlfriend's driveway and thereby impliedly consent to the officers' presence there. *See State v. Castaneda*, 150 Ariz. 382, 389 (1986) ("A third

party validly consents to the search" of property when: "(1) the consent is voluntarily given; and (2) the third party has common authority over or other sufficient relationship to the premises or property searched or seized." (internal quotation marks omitted) (quoting *State v. McGann*, 132 Ariz. 296, 300 (1982))); *State v. Weber*, 887 N.W.2d 554, 567 (Wis. 2016) (reasoning that, where a defendant "declined to submit to a law enforcement officer's lawful attempts to conduct a traffic stop," the defendant instead could have "chosen to stop on the highway, or even in his driveway" and the police "never would have entered his garage").

**¶19** Here, Hernandez could not reasonably harbor any expectation that his girlfriend's curtilage would remain free from police intrusion when he led officers there after they initiated a traffic stop on a public road. Police officers generally may navigate onto a private driveway to the same extent as a private citizen. *Cf. Florida v. Jardines*, 569 U.S. 1, 8 (2013) ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011))). The officers' entry onto the driveway to effectuate a traffic stop that began on a public road does not change the analysis because Hernandez effectively invited them there. As one of the officers testified, he followed Hernandez onto private property because "that's where the vehicle took us when we attempted to stop it." Hernandez's claim that he did not try to flee or elude the traffic stop is of no moment. By leading pursuing officers onto an ungated driveway, Hernandez impliedly consented to the officers' entry onto the curtilage to complete the stop.

**¶20** To the extent Hernandez contends that he was unaware of the officers' efforts to stop him, the record (viewed in the light most favorable to the trial court's ruling) belies his claim and supports the trial court's implicit findings. Before the officers attempted to initiate the traffic stop, Hernandez made several suspicious turns, which caused the officers to believe he was attempting to elude them. Hernandez's seemingly erratic maneuvers, while perfectly legal and perhaps understandable, provide context for the ensuing events; they render implausible any suggestion that he was unaware that the officers were following and, ultimately, attempting to stop him. After the officers initiated the traffic stop by activating their emergency lights and following Hernandez for a few seconds, Hernandez drove over a curb and into the backyard area rather than pull his vehicle over on the wide shoulder of the road.

**¶21** Hernandez suggests that, because the officers were following him closely, he likely did not have sufficient time to safely stop on the road. But even if true, this would not absolve Hernandez of his legal obligation to comply with the traffic stop, nor would it explain why he could not have stopped in the road after passing his girlfriend's driveway. In any event, his speculation undercuts his claim because it demonstrates his likely awareness of the officers' attempt to stop him and belies his purported inability to stop on the road because he managed, instead, to execute an abrupt turn onto the driveway. Viewing these facts in the light most favorable to upholding the trial court's ruling, *Cook*, 115 Ariz. at 192, we conclude that the trial court did not err in denying Hernandez's suppression motion.

**¶22** The State also argues, and the court of appeals held, that the officers' warrantless entry onto Hernandez's girlfriend's property was justified under the hot pursuit doctrine because the officers had probable cause to believe that Hernandez was attempting to flee the traffic stop. *See King*, 563 U.S. at 460 ("Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect."). Because we hold that Hernandez impliedly consented to the stop, we decline to reach this issue.

## III.    Arizona Constitution

**¶23** Hernandez argues that the officers violated his rights under article 2, section 8 of the Arizona Constitution, which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The Arizona Constitution's protections under article 2, section 8 are generally coextensive with Fourth Amendment analysis; however, this Court has recognized more expansive protections under the Arizona Constitution concerning officers' warrantless physical entry into a home. *See, e.g.*, *State v. Ault*, 150 Ariz. 459, 463 (1986); *State v. Bolt*, 142 Ariz. 260, 264–65 (1984); *see also State v. Peltz*, 242 Ariz. 23, 30 ¶ 24 n.3 (App. 2017) ("[T]he right of privacy under article II, § 8 has not been expanded beyond that provided by the Fourth Amendment, except in cases involving unlawful, warrantless home entries."). We are not persuaded that the scope of the Arizona Constitution's protections exceeds the Fourth Amendment's reach under the circumstances of this case. By choosing to lead the officers onto private property after they attempted to stop his vehicle on a public road, thereby impliedly consenting to the officers'

presence and interaction with him on his girlfriend's driveway, Hernandez was not illegally "disturbed in his private affairs." Ariz. Const. art. II, § 8. Accordingly, we hold that the officers' actions did not violate Hernandez's rights under article 2, section 8.

## CONCLUSION

¶24 No citizen has a legal right to ignore or defy an officer's attempt to conduct a lawful traffic stop on a public road. Knowingly failing to comply with a traffic stop is a crime. When the officers attempted to stop Hernandez, he had two lawful options: stop on the public road or lead officers onto private property to complete the stop. Contrary to his argument, the Constitution does not provide a third option positing that a driver may decline to stop on a public road and retreat onto private property, which provides a Fourth Amendment sanctuary from the law. The third option is untenable, as it would endanger police officers and the public by incentivizing flight from law enforcement. Here, because Hernandez impliedly consented to the location of the stop where he led the officers in his vehicle, the officers' actions comported with Fourth Amendment standards.

¶25 We affirm the trial court's denial of Hernandez's motion to suppress, affirm Hernandez's convictions and resulting sentences, and vacate the court of appeals' opinion.

BOLICK, J., concurring.

¶26 I join the Court's well-stated core holding that "the driver's choice to lead the officers to a specific location for the stop constitutes the driver's implied consent to the officer's presence at that location." *Supra* ¶ 17. I write separately to emphasize that the Court's decision stops right there.

¶27 The Court properly recognizes that Hernandez had a reasonable expectation of privacy in the curtilage to the home. *Supra* ¶¶ 12, 15. In his dissent below, Judge Staring correctly concluded that, absent exigent circumstances, a warrant ordinarily is required for police intrusion even in an unenclosed driveway, and certainly in a backyard. *Hernandez*, 242 Ariz. at 577 ¶¶ 32–33, 581 ¶ 49 (Staring, J., dissenting) (citing, *inter alia*, *Jardines*, 569 U.S. at 7–10 and *State v. Olm*, 223 Ariz. 429, 433 ¶ 11, 434 ¶ 17 (App. 2010)). But here, the officers properly initiated a stop on a public street, and by law Hernandez was obliged to comply. *Supra* ¶ 17. Hernandez chose to do so in his girlfriend's driveway, thereby impliedly authorizing the limited police presence there. To hold otherwise would exempt from lawful police stops anyone who turns into a driveway where that person resides or is a guest. This is not a game of tag, where touching home-base shields the pursued.

¶28 The implied-consent holding here provides a narrower and far more solid basis for police presence on private property than the hot-pursuit exigency relied on by the court of appeals. *Hernandez*, 242 Ariz. at 572–76 ¶¶ 11–27. The hot pursuit exigency requires "immediate or continuous pursuit of the [defendant] from the scene of a crime." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). *Welsh* emphasized "that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id.* The pursuit here, which involved a minor civil infraction, and in which an arrest could not have even been initially contemplated, hardly qualifies as hot pursuit, for the reasons ably stated in Judge Staring's dissent. *Hernandez*, 242 Ariz. at 577–81 ¶¶ 34–49 (Staring, J., dissenting).

¶29 Finally, I agree that Hernandez has not demonstrated "that the scope of the Arizona Constitution's protections exceeds the Fourth Amendment's reach under the circumstances of this case." *Supra* ¶ 23. The language of Arizona Constitution article 2, section 8 is starkly different from

the language of the Fourth Amendment. *Compare* Ariz. Const. art. II, § 8 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."), *with* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). It is axiomatic, as a matter of constitutional or statutory interpretation, that where different language is used in different provisions, we must infer that a different meaning was intended. *Rochlin v. State*, 112 Ariz. 171, 176 (1975) (comparing sections of the Arizona Constitution with other state constitutions, the Court concluded that any "difference in language must be respected. If the authors of the constitution had intended the sections to mean the same thing they could have used the same or similar language. The fact that they did not, requires the conclusion that the sections were meant to be different."); *see also Ault*, 150 Ariz. at 466 ("While our constitutional provisions were generally intended to incorporate federal protections, they are specific in preserving the sanctity of homes and in creating a right of privacy." (citation omitted)). As a former chief justice of this Court has aptly observed, our Constitution's "framers had the opportunity to ponder more than 100 years of United States history before penning their own constitution, allowing them to adopt or adjust provisions employed by the federal government or other states to meet Arizona's needs." Rebecca White Berch et al., *Celebrating the Centennial: A Century of Arizona Supreme Court Constitutional Interpretation*, 44 Ariz. St. L.J. 461, 468 (2012). "Had the framers merely intended to mirror the guarantees found in the Federal Bill of Rights, they could have simply adopted the first eight amendments of the U.S. Constitution." *Id.* at 469.

¶30 The Court correctly observes that it has interpreted article 2, section 8's second provision, pertaining to sanctity of the home, significantly more broadly than the United States Supreme Court has interpreted the Fourth Amendment. *Supra* ¶ 23; *see, e.g.*, *Ault*, 150 Ariz. at 466 (deciding "on independent state grounds" not to apply the federal inevitable discovery doctrine, because "exceptions to the warrant requirement are narrow and we choose not to expand them"); *Bolt*, 142 Ariz. at 265 (holding that police entries into a home to secure them pending warrant "are 'per se unlawful' under our state constitution," a holding "based upon . . . its specific wording, and our own cases, independent of federal authority"). It is also true, as the Court observes, that the Court has not extended article 2, section 8 beyond the Fourth Amendment outside of the context of the home. *Supra* ¶ 23. But the Court has never expressly held,

based on considered analysis, that article 2, section 8's first provision, protecting a person's "private affairs" against warrantless government intrusion, is coextensive with the United States Supreme Court's interpretation of Fourth Amendment protections. Given that we have recognized that the second provision provides greater protection than the Fourth Amendment, it would be odd to construe the first provision more narrowly, in lockstep with the Supreme Court's ever-evolving Fourth Amendment jurisprudence. *See State v. Jean*, 243 Ariz. 331, 353–54 ¶¶ 92–96 (2018) (Bolick, J., concurring in part and dissenting in part), *petition for cert. docketed*, No. 17-8419 (U.S. Apr. 6, 2018).

**¶31** Although Hernandez raised state constitutional arguments, he did not argue persuasively why we should interpret article 2, section 8 to require a different result under the circumstances here. Such arguments could properly encompass the constitutional text's plain meaning, its context in our Declaration of Rights, its history and purpose, and analysis of similar provisions in other state constitutions. I agree with my colleagues that it is not obviously apparent that article 2, section 8 proscribes the police conduct here. But further consideration of this provision's scope must await future cases.