925 P.2d 721

**STATE of Arizona, Appellee,**

v.

**Lawrence D. PAXTON, Appellant.**

**No. 1 CA–CR 94–0449.**

Court of Appeals of Arizona,
Division 1, Department A.

April 16, 1996.

Review Denied Oct. 21, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Dawn M. Northup, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Edward F. McGee, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

WEISBERG, Judge.

Lawrence D. Paxton ("defendant") appeals his conviction and life sentence for first degree murder. For the following reasons, we affirm, but modify his sentence to reflect that defendant is entitled to apply for parole after the completion of twenty-five years.

---

1. We view the facts, and all reasonable inferences from those facts, in the light most favorable to sustaining defendant's convictions. *State*

## FACTUAL [1] AND PROCEDURAL BACKGROUND

■ In December 1991, defendant was twenty years old and living in the home of his seventeen-year-old friend, Josh Smaulding, and Smaulding's parents. He and Smaulding shared a room. Neither had a car.

At trial, Smaulding testified to the following version of events. On the morning of December 4, 1991, Smaulding called Eric Edwards, an eighteen-year-old friend who owned a car, to come get him and defendant and drive them around Mesa in the hopes of finding someone to rob. Before Edwards arrived, defendant told Smaulding that he was going to kill Edwards, but Smaulding thought he was joking. There was evidence that defendant thought Edwards was making advances toward defendant's girlfriend.

After Edwards arrived, the three drove off in Edwards' car, with Edwards driving, Smaulding in the passenger seat, and defendant in the back seat. While traveling east on McKellips Road, defendant shot Edwards through the back of the driver's seat with a .38 caliber handgun. Defendant then reached between the two front bucket seats and fired five more times into Edwards' right side. Defendant then leaned over the front seat and steered the car to the side of the road, stopping it by apparently reaching his left foot around the front seat to the brake pedal. Defendant and Smaulding then pulled Edwards out of the car and put him in the rear hatchback area of the car. There were no other cars in the area.

At defendant's direction, Smaulding drove to a secluded desert area. There, they both took Edwards out of the car and left him in a ditch after defendant had taken his wallet. They then drove through a carwash and later rented a motel room. It was defendant who registered and paid for the room. Shortly thereafter, they returned to Smaulding's home, where Smaulding packed some clothing. He had decided to go to Los Angeles to

*v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

avoid trouble. While at home, Smaulding's sister walked into their room and saw defendant looking through a wallet that was not his. Defendant and Smaulding then returned to the motel room for the night. At 4:00 a.m., Smaulding decided to leave for California in Edwards' car, but first drove defendant to Smaulding's home.

While Smaulding was in Los Angeles, he kept in frequent phone contact with defendant. When defendant informed him that the police were getting suspicious, Smaulding burned the car. By mid-December, Mesa police had narrowed their investigation to defendant and Smaulding, whom they contacted in Los Angeles. Smaulding then returned to Mesa and led police to Edwards' body. The murder weapon had been found in defendant's and Smaulding's room, under Smaulding's mattress.

Meanwhile, defendant had been denying his involvement, saying that Edwards had dropped off both him and Smaulding at the house of a friend, Marques Bynum, later that day. He also said that Edwards was killed by Smaulding and Bynum because they wanted his car. Defendant was nevertheless arrested and charged with first degree murder.

Defendant testified at trial, changing his story from what he had told police. At trial, he admitted that he was present when Edwards was killed. He testified that he, Edwards, and Smaulding had driven to a secluded spot to smoke marijuana. Consistent with Smaulding's version, Edwards was in the driver's seat, Smaulding in the passenger's seat, and defendant in the back seat. After they had been smoking for a few minutes, Smaulding pulled the .38 out of his coat, pointed it at Edwards, and fired five shots into his right side. Edwards then opened the driver's-side door and was attempting to exit the car when Smaulding fired the final shot into his back, causing Edwards to fall back into the car. Smaulding then dragged Edwards from the car and left him in the ditch.

Apparently believing Smaulding's testimony rather than defendant's, the jury convicted defendant as charged. The trial court sentenced defendant to life imprisonment with credit for 867 days of pre-sentence incarceration.

Defendant has timely appealed. We have jurisdiction pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") sections 12–120.21(A)(1), 13–4031, and 13–4033(A).

## ISSUES PRESENTED

Defendant presents the following issues:

1. Whether the trial court erred in denying defendant's motion to suppress evidence garnered from the warrantless seizure of his shoes prior to his arrest;

2. Whether the trial court abused its discretion in allowing the testimony of the state's so-called "seat-cover witnesses," who had not been disclosed prior to trial;

3. Whether the trial court abused its discretion in allowing the testimony of a state's witness who had been uncooperative in arranging a defense interview;

4. Whether the trial court abused its discretion by failing to make a contemporaneous, verbatim record of bench conferences on motions and objections;

5. Whether the trial court erred by refusing defendant's "theory of the case" instruction; and

6. Whether the trial court erred in calculating defendant's pre-sentence incarceration credit.

## DISCUSSION

### A. *Motion to Suppress*

During the early morning of December 18, 1991, Detective Mark Jones of the Mesa Police Department interviewed defendant at the stationhouse. Defendant had not yet been arrested and had come to the stationhouse voluntarily at Detective Jones' request. Detective Jones, however, already had probable cause to arrest defendant and was going to do so immediately after the interview.

Midway through the interview, in an attempt to elicit a confession, Detective Jones told defendant to give him his shoes and defendant complied. After getting the shoes, Detective Jones falsely told defendant that the police had discovered Edwards' body

and found shoeprints around it, which matched defendant's. Detective Jones then noticed a stain on the shoes which he believed might be blood. When the shoes were tested, that stain turned out not to be blood, but other stains found elsewhere on the shoes were determined to be blood. Bloodstains were also later found on defendant's coat and pants, which had been impounded when defendant was booked into jail upon his arrest following the interview.

The state conducted DNA analysis of the blood found on defendant's shoes and clothing. By the time Edwards' body was found, however, it was too decomposed to provide a DNA sample. Nevertheless, the state took DNA samples from Edwards' parents and determined there was a 2,745 to one probability that the blood on defendant's shoes and clothing came from their offspring.[2]

Defendant moved to suppress the evidence gathered from his shoes, arguing that the shoes were seized prior to his arrest and without a warrant. The trial court initially granted the motion, finding that the seizure was warrantless and not incident to arrest. The state, however, moved for reconsideration, arguing that the evidence would have been inevitably discovered upon defendant's being booked into jail after his arrest, which was to occur after the interview. The trial court thereupon changed its ruling, applying the inevitable discovery exception to the exclusionary rule.

Defendant argues on appeal that the trial court erred by applying the inevitable discovery rule. The state in turn argues that: 1) the seizure did not violate the Fourth Amendment because it was incident to arrest, 2) if it did, the inevitable discovery rule is applicable, and 3) in any event, the error was harmless. Assuming *arguendo* that the warrantless seizure violated the Fourth Amendment, we conclude that the disputed evidence was admissible pursuant to the inevitable discovery rule.

■ Evidence obtained in violation of the Fourth Amendment need not be suppressed when that evidence would inevitably have been discovered by lawful means. *Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). In such situations, the deterrence rationale for the exclusionary rule has little basis. *Id.* at 444, 104 S.Ct. at 2509. "Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial ... but would inflict a wholly unacceptable burden on the administration of criminal justice." *Id.* at 446–47, 104 S.Ct. at 2510.

■ Arizona recognizes the inevitable discovery doctrine. *See, e.g., State v. Castaneda,* 150 Ariz. 382, 387, 724 P.2d 1, 6 (1986); *State v. Lamb,* 116 Ariz. 134, 138, 568 P.2d 1032, 1036 (1977). For example, in *Castaneda,* our supreme court held that, though the defendant was coerced into telling police where the victim's body was, the evidence was admissible because the body inevitably would have been discovered as soon as it became light. 150 Ariz. at 387, 724 P.2d at 6. The court similarly held in *Lamb* that evidence discovered during an illegal pat-down search of the defendant was admissible because he would have been arrested on independent grounds and the evidence inevitably discovered during the lawful search incident to that arrest. 116 Ariz. at 138, 568 P.2d at 1036. *But see State v. Ault,* 150 Ariz. 459, 465, 724 P.2d 545, 551 (1986) (declining to use inevitable discovery exception where illegal search invaded the defendant's home, based on the Arizona Constitution's special protection of the privacy of the home).

Defendant relies upon *State v. Calabrese,* 157 Ariz. 189, 755 P.2d 1177 (App.1988), in which Division Two of this court held that a subsequent routine booking search cannot justify a warrantless seizure of evidence prior to an arrest. In *Calabrese,* the defendant

---

**2.** We note that defendant has not challenged the introduction of this testimony. *Compare State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993) (holding evidence of DNA random match probability statistics inadmissible), *cert. denied,* — U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994) *with State v. Johnson,* 183 Ariz. 623, 905 P.2d 1002 (App.1995) (holding similar evidence admissible). Even if the introduction of this evidence was error, however, it would have been harmless because defendant admitted being near Edwards' body at the time of the shooting and afterward; there was no question about whose blood was on defendant's clothing.

was arrested for trespassing on the grounds of a hospital. Incident to the arrest, police searched his pockets and found narcotics. Responding to the defendant's motion to suppress, the state argued that the search was valid as incident to the defendant's arrest and that, in any event, the narcotics would have been inevitably discovered when the defendant was booked into jail. On appeal from the trial court's denial of the defendant's motion, Division Two of this court concluded that the search was, in fact, incident to arrest and therefore valid under the Fourth Amendment. It also concluded, though, that the inevitable discovery exception would not have been applicable:

> If we were to allow all warrantless searches to be justified by the argument that any evidence would ultimately have been discovered on booking at the jail, police officers would have a license to immediately and thoroughly search the person and effects of any individual arrested without a warrant for any minor but bookable offense in the hope of discovering evidence of a more serious crime. That would result in the arrestee being booked on the greater charge and the search being justified as an accelerated booking search. We do not believe that constitutes a permissible exception to the requirement for a warrant. *See People v. Laiwa*, 34 Cal.3d 711, 195 Cal.Rptr. 503, 513, 669 P.2d 1278, 1288 (1983).[3]

*Id.* at 191–92, 755 P.2d at 1179–80.[4]

*Calabrese*, however, is not controlling for two reasons. First, the court's discussion of this issue was *dicta*. The court had already determined that the trial court had properly denied the defendant's motion to suppress because there had been no Fourth Amendment violation. There was no need, therefore, to consider whether the inevitable discovery exception applied.

Second, *Calabrese* is distinguishable on its facts. The defendant there was arrested for

criminal trespass, a misdemeanor, and therefore could have been released without booking. Thus, discovery of the narcotics through the booking procedure was not inevitable. In the instant case, though, defendant was to be arrested for a homicide. Booking and the subsequent discovery of the evidence, therefore, were inevitable. *See infra.*

Moreover, the *Calabrese* court's concerns about booking the arrestee on greater charges after the discovery of evidence of an unrelated crime is not present in the instant case because the evidence discovered here was related to the same crime for which he was being arrested. *Calabrese*, therefore, is not applicable.

 In the instant case, Detective Jones testified that, even before he had seen the shoes, he intended to arrest defendant following the interview and have him booked into the city jail, and that his seizure of the shoes played no part in his decision to ultimately do so. He also testified that, upon being booked into jail, suspects surrender their clothing for jail garments, and that, in major cases such as this, the standard policy is for the arrestee's clothing to be analyzed after booking. Moreover, he had a particular reason to analyze defendant's clothing because he had information that they had been worn by defendant on the day of the murder. Testing clothing seized after booking a defendant is permitted. *See Bible*, 175 Ariz. at 599, 858 P.2d at 1202 (no violation of Fourth Amendment to test clothing seized without a warrant when police already had possession of it due to defendant's incarceration); *State v. Gonzales*, 111 Ariz. 38, 44, 523 P.2d 66, 72 (1974).

We therefore conclude that the evidence was sufficient to allow the trial court to conclude that the bloodstains on defendant's shoes would have been inevitably discovered despite any premature seizure. *See Michelena*, 115 Ariz. at 109–10, 563 P.2d at 908–09.

---

3. *Laiwa* was decided on California state constitutional grounds.

4. The court in *Calabrese* did not mention *State v. Michelena*, 115 Ariz. 109, 563 P.2d 908 (App. 1977), another Division Two case that apparently reaches a different conclusion of law. In *Mi-*

*chelena*, the court held that evidence obtained through a violation of *Miranda* was admissible because it inevitably would have been discovered during a routine search when defendant was booked into jail. *Id.* at 109–10, 563 P.2d 908–09.

Moreover, in approving the inevitable discovery exception in these circumstances, we are consistent with the Ninth Circuit, which has also held that evidence discovered during a premature warrantless search is admissible if it would inevitably have been discovered during a routine booking procedure. *See United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986); *see also United States v. Woolbright,* 641 F.Supp. 1570, 1577–78 (E.D.Mo. 1986).

■ We further note that, in any event, a wrongful seizure and search of the shoes would have been harmless. An error is harmless if we believe beyond a reasonable doubt that it did not contribute to or affect the verdict. *Bible,* 175 Ariz. at 588, 858 P.2d at 1191. Here, defendant admitted at trial that he was present when the murder occurred and was in close proximity to Edwards at the time of the shooting and afterwards. Given that defense, the fact that defendant had Edwards' blood on his shoes was not particularly damning. Furthermore, Edwards' blood also was found on other items of defendant's clothing, and defendant has not contested that such other evidence was properly admitted. Thus, any evidence that Edwards' blood was on defendant's shoes was, beyond a reasonable doubt, harmless.

## B. *The State's Seat Cover Witnesses*

A blood-stained seat cover was found with Edwards' body. An issue at trial was whether this seat cover had been on the driver's seat when Edwards was shot. If it had, Smaulding's story that defendant shot Edwards through the seat would have been impossible because there was no bullet hole in the seat cover. The state, however, contended that Edwards had removed the seat cover earlier because its straps were broken, and that he was storing it in the rear of the vehicle, where it became blood-stained when his body was placed there after he had been shot.

Edwards' mother testified that, as of December 2, 1991, Edwards had removed the cover. The state also offered the testimony of three other witnesses, who were not timely noticed to defendant, on the issue of whether the seat cover was on the seat on December 4, 1991. They were Shannon Smith, Edwards' girlfriend; Nate Hill, Edwards' friend; and Mark Little, an expert who enhanced and analyzed photographs of the car, determining that there was a difference in the colors of the two front seats.

Defendant argues that the trial court erred in allowing this testimony for three reasons: 1) the witnesses were not timely disclosed; 2) their testimony was not relevant; and 3) Little should not have been allowed to testify on rebuttal when he had been precluded from testifying in the state's case-in-chief.

### 1. *Failure to timely disclose*

■ Rule 15.1(a)(1), (4), Arizona Rules of Criminal Procedure ("Rule(s)"), requires the prosecution to disclose to defendant all the witnesses and exhibits it will present in its case-in-chief. The state concedes that it did not comply with this rule with respect to these three witnesses.

Rule 15.7 provides that, for violations of the discovery rules, "the court may impose any sanction which it finds just under the circumstances." Reviewing the trial court's decision on sanctions for discovery violations for an abuse of discretion, *State v. Lukezic,* 143 Ariz. 60, 69, 691 P.2d 1088, 1097 (1984); *State v. Tyler,* 149 Ariz. 312, 315, 718 P.2d 214, 217 (App.1986), we conclude that the trial court acted within its discretion by not precluding the state's three witnesses from testifying.

To begin, the state's failure to disclose these witnesses was, at least in part, a result of defendant's own failure to disclose his defenses pursuant to Rule 15.2(b). Defendant's notice of defenses alleged only the following: lack of general and specific intent, insufficiency of the evidence, alibi, and good character; mere presence was not listed as a potential defense. In fact, prior to trial, defendant had consistently denied his presence and relied upon an alibi defense. It was not until just before trial that defendant informed the state that his defense might change from alibi to mere presence; i.e., that he would be admitting his presence but contending that Smaulding had shot Edwards

from the front seat, and thereby focusing upon the seat cover.

The location of the seat cover was not a disputed issue until defendant changed his trial strategy. Had defendant been diligent in apprising the state of his defense, the state would have been more likely to realize the significance of the seat cover and to arrange for appropriate witnesses. Once the state realized the need for such testimony, it promptly found the three witnesses and notified defendant.

Next, defendant had sufficient time to interview these witnesses before their testimony. Our supreme court recently stated that "some discovery violations can be easily solved ... by allowing a witness to be interviewed during trial." *State v. Krone*, 182 Ariz. 319, 322, 897 P.2d 621, 624 (1995). In the instant case, defendant interviewed Smith three days before her testimony. With respect to Hill, the state's investigator interviewed him, prepared a report, and gave that report to defendant on November 4, 1993, four days before trial.[5]

In addition, defendant never requested a continuance to conduct more discovery; nor has he alleged why this period of time was inadequate or how he was prejudiced. Accordingly, we conclude that, under these circumstances, the trial court did not abuse its discretion in permitting these witnesses to testify. *See Tyler*, 149 Ariz. at 315, 718 P.2d at 217 (finding no abuse of discretion when trial court permitted an untimely-disclosed witness to testify where defendant had enough time to interview the witness—witness disclosed two days before trial and seven days before her testimony).

### 2. *Relevance*

 Defendant also argues that the trial court erred by admitting this testimony because it was not relevant. We disagree.

As previously discussed, whether the seat cover was on the seat when Edwards was shot was a crucial issue in the case. Smith testified that she knew that the passenger's seat had a cover on it, but was not certain

whether the driver's seat did. The state, however, offered a photograph of Edwards' car that Smith testified was taken within three months of the murder. The photograph appears to show a seat cover on the passenger's side but not on the driver's.

Hill testified that he had ridden in Edwards' car "probably every other day," and that sometime in Fall 1991 the seat cover was off and "floating around" in the back seat and the hatch because the straps were broken. He also testified that he had ridden in Edwards' car the day before the murder and did not recall the seat cover being on the driver's seat. In addition, Little, relying on digital enhancement of Smith's photograph, testified that there was a difference in color between the driver's seat and the passenger's seat.

Defendant claims that Smith's and Hill's testimony was not relevant because it concerned the condition of the seat cover at a time too remote from the date of the murder. Little's testimony, according to defendant, was similarly irrelevant because it relied upon Smith's photograph. We disagree.

 . This evidence was clearly relevant because, although some of it established only that the seat cover had been off up to three months before the date in question, that fact still makes it more likely that it was off when Edwards was shot. This is especially true since the seat cover was off because the straps were broken. Remoteness in time accordingly goes to the weight of the evidence, not its relevance. *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 499, 733 P.2d 1073, 1082, *cert. denied*, 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987); *State v. Jeffers*, 135 Ariz. 404, 418, 661 P.2d 1105, 1119, *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). We therefore find no error.

### 3. *Little's testimony on rebuttal*

Defendant also argues that, because the trial court precluded Little's testimony in the state's case-in-chief, it was error to allow it on rebuttal. We disagree.

---

5. The court refused to let Little testify in the state's case-in-chief, permitting his testimony only in rebuttal. The propriety of that decision will be discussed *infra*.

588

First, defendant concedes that he did not raise this objection below. This issue, therefore, is waived absent fundamental error. *State v. Hernandez,* 170 Ariz. 301, 307, 823 P.2d 1309, 1315 (App.1991). Fundamental error is an error that reaches the foundation of the case, takes from defendant a right essential to the defense, or is of such dimension that it denies defendant a fair trial. *State v. King,* 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). Any error in introducing Little's testimony would not be so egregious as to constitute fundamental error.

Second, we disagree with defendant's assertion that the state had nothing to rebut because defendant had offered nothing in the presentation of his case regarding the condition or location of the seat cover. While defendant himself did not discuss the issue in his testimony, his expert witness did:

Q [by defense counsel]: Now, is it possible that that wound to the back could have been sustained from the evidence you saw in any other manner than Mr. Edwards being shot from the back seat?

A: It is likely it was sustained in some other manner.

Q: Could you explain that?

A: If he were shot in the back and in the seat, well, that assumes the seat cover was on the seat, and there is no bullet hole found. If, on the other hand, the seat cover wasn't on it, perhaps in addition to the wound path, the bullet would also be effected [sic] by the seat cover.

Thus, defendant did present testimony in his case for which Little's testimony was proper rebuttal.

Third, the state's untimely disclosure of witness Little did not require prohibiting his testimony on rebuttal. *See State v. Sullivan,* 130 Ariz. 213, 216–17, 635 P.2d 501, 504–05 (1981). "[I]t is obviously unreasonable to require the State to list in advance of trial and prior to the presentation of the defendant's case the names of all potential rebuttal witnesses, since the prosecution can rarely anticipate what course the defense will pursue." *Id.* Until the state discovered that defendant's defense involved challenging the location of the seat cover, it could not know that it would need such rebuttal. We therefore find no error.

### C. *Judd Russell's Testimony*

The state also presented the testimony of Judd Russell, a friend of defendant. Russell testified that, following the murder, defendant asked him to fabricate an alibi for him. Defendant argues on appeal that the trial court erred in allowing this testimony because, due to Russell's failure to cooperate, defendant had been unable to interview Russell prior to his testifying. We conclude, however, that the trial court did not abuse its discretion.

In its initial notice of discovery filed almost two years before trial, the state informed defendant that Russell was a potential witness. Defendant thus had ample opportunity to arrange an interview. Furthermore, Rule 15.3(a)(2) provides the remedy for an uncooperative material witness: upon motion by a party, the court may order the witness to submit to an interview. Defendant never requested that order.

We also note that defendant's inability to interview Russell was through no fault of the state, and that Russell had not cooperated with the state's request for an interview, either. Under these circumstances, we conclude that the trial court did not abuse its discretion in permitting Russell to testify.

### D. *Failure to Make Contemporaneous Record of Bench Conferences*

Prior to trial, the trial court informed counsel that it preferred to avoid numerous bench conferences. When asked if bench conferences would be on the record, the court replied:

They are not. If you need to make something on the record, we will take the time and opportunity. Additionally, I may well—the other practice I have is then at a break, let a record be made. If, in fact, someone thinks someone is getting into areas that shouldn't be gotten into, object, go from there. If you think anything else needs to be made, at the earliest opportunity, I will give you full rein to make a complete objection. If we haven't antici-

pated it and if you think there is that need and I have already disagreed with you with respect to evidence that may or may not be admissible, otherwise, to come in.

Though defendant did not object to this procedure, he now claims that it constitutes fundamental error.

As defendant has noted, the courts of this state have frequently disapproved of not recording such conferences. *See, e.g., Gosewisch v. American Honda Motor Co.,* 153 Ariz. 400, 402, 737 P.2d 376, 378 (1987); *State v. Bay,* 150 Ariz. 112, 115, 722 P.2d 280, 283 (1986); *State v. Fletcher,* 149 Ariz. 187, 189, 717 P.2d 866, 868 (1986); *State v. Sanchez,* 130 Ariz. 295, 301, 635 P.2d 1217, 1223 (App. 1981); *State v. Babineaux,* 22 Ariz.App. 322, 324, 526 P.2d 1277, 1279 (1974). We take this opportunity to express our own disapproval of this practice because it fails to make a complete record for appeal.

> While at times [this practice] may be expedient and avoid some delay, it more often leads to confusion and inefficiency, frequently defeating the goal of preserving for appellate review an accurate record of what actually transpired in the trial proceedings.

*Babineaux,* 22 Ariz.App. at 324, 526 P.2d at 1279.

Notwithstanding, none of the cases cited by defendant have concluded that the practice constitutes error, let alone reversible error. In the instant case, the parties were not prevented from making contemporaneous objections. As Division Two stated in *Sanchez,* recognized legal objections should be made in open court without argument since "[m]ore often than not, the court's ruling on a stated legal objection will be sufficient and no further record will be necessary." 130 Ariz. at 301, 635 P.2d at 1223.

Furthermore, defendant has shown no prejudice from the lack of a contemporaneous record of bench conferences. *See id.* (no reversible error absent showing of demonstrable prejudice). The only possible prejudice would be defendant's subsequent inability to show on the record that he preserved an issue for appeal. But defendant has pointed to no appealable issues for which an alleged unrecorded objection had been made

at a bench conference. He therefore has demonstrated no prejudice.

Accordingly, although we disapprove of the practice, we conclude that, in the instant case, the trial court's failure to record bench conferences does not constitute reversible error.

### E. *Failure to Give Defendant's "Theory of the Case" Instruction*

Next, the trial court declined to give defendant's proposed instruction regarding his theory of the case, which read:

> The Defendant's theory of the case is that he was merely present when Josh Smaulding shot Eric Edwards and that the government has failed to prove beyond a reasonable doubt that the defendant participated in the shooting of Eric Edwards.
>
> If you find that the evidence and testimony in this case permits the possibility that the defendant's version of the facts may be true or if the evidence and testimony fails to prove beyond a reasonable doubt that the defendant committed the crime charged, you must find the defendant not guilty.

Defendant argues on appeal that the court erred by denying this instruction. We disagree.

Defendant correctly points out that a trial court is required to give an instruction on any theory reasonably supported by the evidence. *See State v. Lucas,* 146 Ariz. 597, 603, 708 P.2d 81, 87 (1985). In the instant case, however, the trial court *did* give a mere presence instruction. It also properly instructed the jury on the state's burden of proof. A trial court is not required to give a proposed instruction that merely reiterates instructions already given. *State v. Salazar,* 173 Ariz. 399, 409, 844 P.2d 566, 576 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993).

We also note that defendant's proposed instruction contains an incorrect statement of the law, and a trial court does not err in refusing to give an instruction that misstates the law. *State v. Rivera,* 177 Ariz. 476, 479, 868 P.2d 1059, 1062 (App.1994).

**590**

Defendant's proposed instruction states that the jury may find defendant not guilty if the evidence "permits the possibility that the defendant's version of the facts may be true." That is not the equivalent of proof beyond a reasonable doubt. The trial court, therefore, did not err in refusing defendant's "theory of the case" instruction.

### F. *Sentencing Issues*

Lastly, the trial court credited defendant with 867 days of pre-sentence incarceration. Defendant argues, and we agree, that the trial court erred in this calculation. Defendant was arrested on December 18, 1991, and was sentenced on May 18, 1994. Consequently, the correct number of days of pre-sentence incarceration is 882.

Also, while the minute entry reflecting defendant's sentence merely states that defendant is sentenced to life imprisonment, the trial court's special verdict states that he is sentenced to "natural life," suggesting that the sentence is not subject to parole. *See* A.R.S. § 13–703(A) (1995 Supp.). The sentencing code in effect at the time of defendant's offense, however, provided that all defendants sentenced to life imprisonment for first degree murder are entitled to apply for parole after twenty-five years if the victim was fifteen years old or older. A.R.S. § 13–703(A) (1989). Defendant, therefore, is entitled to apply for parole after twenty-five years.

### CONCLUSION

Pursuant to A.R.S. section 13–4037(A), the trial court's May 18, 1994 minute entry is modified to allow credit for 882 days of pre-sentence incarceration and to reflect that defendant is entitled to apply for parole after the completion of twenty-five years. We have searched the record for further fundamental error and have found none. Accordingly, we affirm defendant's conviction and sentence, as modified.

CONTRERAS, P.J., and TOCI, J., concur.