399 P.3d 115

The STATE of Arizona, Appellee,

v.

Anthony Lito HERNANDEZ, Appellant.

No. 2 CA-CR 2015-0229

Court of Appeals of Arizona,
Division 2.

Filed June 23, 2017

Mark Brnovich, Arizona Attorney General, Joseph T. Maziarz, Chief Counsel, Phoenix, By Amy M. Thorson, Assistant Attorney General, Tucson, Counsel for Appellee

John William Lovell, Tucson, Counsel for Appellant

Judge Miller authored the opinion of the Court, in which Judge Espinosa concurred and Presiding Judge Staring dissented.

## OPINION

MILLER, Judge:

¶ 1 After a jury trial, Anthony Lito Hernandez was convicted of transportation of methamphetamine for sale, possession of marijuana, and possession of drug paraphernalia, and sentenced to a combined prison term of eleven years. On appeal, he challenges the trial court's denial of his motion to suppress evidence. Resolving this issue requires us to determine whether law enforcement officers attempting to complete an investigatory stop for a civil traffic violation were required to obtain a search warrant before approaching the vehicle after the driver pulled into a private driveway. For the reasons that follow, we conclude Hernandez's

constitutional rights were not violated by the officers approaching the vehicle stopped in the driveway. We therefore affirm the order denying Hernandez's motion to suppress, and his convictions and sentences.

## Factual and Procedural Background

¶ 2 "In reviewing a motion to suppress, we consider only the evidence presented at the suppression hearing, viewing it in the light most favorable to sustaining the trial court's ruling."[1] *State v. Reyes*, 238 Ariz. 575, ¶ 2, 364 P.3d 1134, 1135 (App. 2015). On the night of September 11, 2014, Cochise County Sheriff's Deputies Villa and Gilbert, on patrol in Willcox, observed a vehicle make an abrupt stop and then an immediate turn. The officers followed as the vehicle made a series of turns at various intersections in a random zigzag pattern. When they were able to get close enough, they ran a license plate check on the car, which "indicated that there had been an insurance cancellation" the previous month.

¶ 3 The deputies had to catch up with the car to initiate a traffic stop regarding the insurance cancellation. When the patrol car closed within two to three car lengths of the vehicle, they activated their emergency lights. Shortly thereafter, the vehicle turned[2] onto a private driveway, not stopping, and proceeded into the backyard area of the residence. The deputies did not know if Hernandez had any connection to the property and were not concerned about the home ownership because "we were trying to make a traffic stop of the vehicle." Deputy Villa explained that he followed Hernandez's car onto the property "[b]ecause that's where the vehicle took us when we attempted to stop it." He did not believe there would be any danger to the public, to himself, or to any other law enforcement officers if he did not make immediate contact with the car. Neither did Deputy Villa "give any thought at all to getting a warrant to search the vehicle."

---

1. Following oral argument in this court, we requested that the Cochise County Superior Court provide us with the exhibits from the suppression hearing. The clerk's office subsequently informed us that it could not locate them.

2. The nature of the turn was described as elongated or sweeping. The angle of the turn is not dispositive of the Fourth Amendment issue or even a significant fact.

¶ 4 Deputy Gilbert was asked whether he "fe[lt] that immediate contact was necessary with the operator of the motor vehicle to prevent any harm to the community," and he thought "there was." He stated, "I fe[lt] based on previous training and experience, he is deciding to run, has decided to run or is already going to and that immediate contact needs to be made."

¶ 5 As Deputy Villa attempted to call in the stop on his cell phone rather than the radio because of transmission difficulties, Deputy Gilbert approached the vehicle. Hernandez had already begun to get out and was directed to remain inside. Deputy Gilbert walked toward the car and smelled marijuana. He then ordered Hernandez to step out and place his hands behind his back, after which Deputy Gilbert handcuffed Hernandez and checked him for weapons. During the pat-down, he found a large, folded stack of paper currency and an empty plastic baggie in one of Hernandez's pockets. In other pockets, Deputy Gilbert found a wallet and two "stack[s] of folded United States currency of various denominations." Altogether, Hernandez was carrying over $2,400. The search of Hernandez's car revealed a burned marijuana cigarette, a metal spoon with char marks on the bottom and "a burned substance in it," and a clear plastic baggie containing suspected methamphetamine.

¶ 6 Hernandez initially denied knowing the identity or ownership of the residence where he stopped. It was later determined that the residence was occupied by Hernandez's girlfriend.

¶ 7 Hernandez was arrested and indicted on various drug offenses. He moved to suppress the evidence seized by the deputies and the trial court held an evidentiary hearing, also requesting supplemental memoranda. At a pretrial conference, the court denied the motion, stating in part:

> Mr. Hernandez was within the curtilage of his girlfriend's home when he was detained for a civil traffic offense. There was no probable cause or reasonable suspicion that he was engaged in any criminal activi-

ty, prior to his detention.... Mr. Hernandez clearly was an invitee ... and he had a reasonable expectation of privacy within the curtilage of the home.... [B]ased upon the evidence, the Court does find that the pursuit began in public, and then it went into the backyard which is clearly curtilage, but it's not in the home. I know there are cases that indicate, well, if it's curtilage, it should be viewed just like the home, but this circumstance is a little bit different. It's the girlfriend's home. It's in the backyard. It's not actually through the entryway.... If you look at the entire thing in terms of reasonableness, is it reasonable? Was it reasonable for the officers to follow into the backyard under the circumstances? I guess my answer on that would be that it was, and there was no violation of the [Four]th Amendment that would necessitate suppression.[3]

¶ 8 Challenging only the suppression ruling, Hernandez appeals and we have jurisdiction pursuant to A.R.S. §§ 13–4031 and 13–4033(A)(1).

## Discussion

 ¶ 9 Hernandez argues the deputies' entry onto private property without a warrant to complete the investigation of a civil infraction violated his rights under the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. In reviewing a ruling on a motion to suppress for an alleged Fourth Amendment violation, "we defer to the trial court's factual findings, but we review *de novo* mixed questions of law and fact and the trial court's ultimate legal conclusion." *State v. Wyman*, 197 Ariz. 10, ¶ 5, 3 P.3d 392, 395 (App. 2000). The state must prove the lawfulness of a search by a preponderance of the evidence. Ariz. R. Crim. P. 16.2(b).

 ¶ 10 The Fourth Amendment assures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-

---

**3.** In addition to the excerpted statements already noted, the trial court stated: "And based upon the circumstances of this case, I do find that the

reasoning of [*United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)] does apply to Mr. Hernandez'[s] case."

zures." [4] U.S. Const. amend. IV. Accordingly, law enforcement officers may not enter a person's home to arrest him or her without an arrest warrant, the consent of the person, or exigent circumstances. *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest). "Mere incantation of the phrase 'exigent circumstances' " is not sufficient. *State v. Martin*, 139 Ariz. 466, 474, 679 P.2d 489, 497 (1984), *quoting People v. Barndt*, 199 Colo. 51, 604 P.2d 1173, 1175 (1980). For instance, where the state has determined that an offense is minor and no imprisonment is possible, officers may not enter the person's home even when investigating an offense that just occurred. *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (exigent-circumstances exception does not apply where DUI suspect left vehicle and entered his home). Rather, "an objectively reasonable basis must exist for officers to believe that the circumstances justify a warrantless entry." *State v. Wilson*, 237 Ariz. 296, ¶ 9, 350 P.3d 800, 802 (2015).

¶ 11 One such exigent circumstance is the "hot pursuit of a fleeing felon." *State v. Love*, 123 Ariz. 157, 159, 598 P.2d 976, 978 (1979). Under this exception, "a suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place." *United States v. Santana*, 427 U.S. 38, 43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *see also State v. Tassler*, 159 Ariz. 183, 185, 765 P.2d 1007, 1009 (App. 1988) (once officers formed intent to arrest defendant, "[t]hat arrest could not be defeated by [a] retreat"). Hot pursuit involves "some element of a chase," *Santana*, 427 U.S. at 42 n.3, 96 S.Ct. 2406, and "immediate or continuous pursuit ... from the scene of a crime." *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091; *United States v. Johnson*, 256 F.3d 895,

907 (9th Cir. 2001). However, hot pursuit "need not be an extended hue and cry 'in and about (the) public streets,' " and "[t]he fact that [a] pursuit ... ended almost as soon as it began [does] not render it any the less a 'hot pursuit' sufficient to justify [a] warrantless entry." *Santana*, 427 U.S. at 43, 96 S.Ct. 2406.

¶ 12 Under the Fourth Amendment, curtilage—"the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life' "—is generally considered part of the home. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), *quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). "A driveway[, however,] is only a semiprivate area." *State v. Cobb*, 115 Ariz. 484, 489, 566 P.2d 285, 290 (1977), *quoting United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975); *see also State v. Blakley*, 226 Ariz. 25, ¶ 7, 243 P.3d 628, 630 (App. 2010) (driveway, although in curtilage, considered semiprivate). For the purposes of our analysis, we accept the trial court's finding that Hernandez did not enter the house, but was within the curtilage. This fact, however, remains relevant in determining whether the deputies' actions in following Hernandez's car into the backyard were reasonable.

¶ 13 Hernandez argues the trial court erroneously relied on *Santana* when denying his motion to suppress. There, an undercover officer arranged a drug sale with a suspect, who guided the officer to Santana's house, where the suspect took marked money from the officer, went inside, and returned with several envelopes of heroin. 427 U.S. at 39–40, 96 S.Ct. 2406. The officer arrested the suspect and took her to a police station. *Id.* at 40, 96 S.Ct. 2406. Several other officers then drove to the house and saw Santana standing in the doorway. *Id.* The officers identified themselves and Santana retreated into the house, prompting the officers to

---

4. "The Arizona Constitution is even more explicit in safeguarding this liberty: 'No person shall be disturbed in his private affairs, *or his home invaded*, without authority of law.' " *State v. Martin*, 139 Ariz. 466, 473, 679 P.2d 489, 496 (1984), *quoting* Ariz. Const. art. II, § 8 (emphasis in *Martin*). But other than in the context of a warrantless entry into the home itself, Arizona's courts have concluded that the protections of art. II, § 8 are coextensive with those of our federal constitutional jurisprudence. *See State v. Peltz*, 242 Ariz. 23, n.3, 391 P.3d 1215, 1222 n.3(App. 2017).

follow and apprehend her inside. *Id.* at 40–41, 96 S.Ct. 2406. They found some of the marked money on her person. *Id.* at 41, 96 S.Ct. 2406. The Court considered "whether [Santana's] act of retreating into her house could thwart an otherwise proper arrest," and concluded "it could not" because the officers were engaged in "a true 'hot pursuit.' " *Id.* at 42, 96 S.Ct. 2406.

¶ 14 While not disputing that the deputies' pursuit of him began in public, Hernandez argues he did not try to flee or evade the deputies, which he contends are necessary to find that law enforcement was in "hot pursuit." Furthermore, he maintains *Santana* only considered scenarios in which "the police possessed probable cause to arrest" a defendant and where the defendant's actions "created an exigency whereby evidence of a serious crime would have been destroyed had police delayed their pursuit." He reasons that because the failure to have automobile insurance is a civil infraction and there was no concern evidence would be destroyed by his actions, there was not the predicate probable cause.

■ ¶ 15 The state argues "it is irrelevant that [Hernandez] was not subject to arrest for the civil traffic violation because, by the time [the] deputies followed [Hernandez] into the backyard, they had probable cause to arrest him for a felony offense," citing A.R.S. § 28–622.01. It posits that an objective viewing of the failure to stop and purposeful turn onto private property "gave the deputies probable cause to arrest him for unlawful flight." Alternatively, the state suggests Hernandez's "failure to stop" violated A.R.S. § 28–1595(A).[5]

■ ¶ 16 Section 28–622.01 provides, "A driver of a motor vehicle who willfully flees or attempts to elude a pursuing official law enforcement vehicle . . . is guilty of a class 5

felony." We have interpreted "attempt to elude" to connote "adroit maneuvers[,] quick turns, driving with the lights off, driving where the pursuing vehicle could not follow, or attempting to hide." *State v. Fogarty*, 178 Ariz. 170, 172, 871 P.2d 717, 719 (App. 1993). "The term 'flee' usually, but not always, connotes speed." *Id.* However, "any refusal to stop on command of an officer who is *in a police car* violates the felony flight statute because of the potential for personal danger inherent in vehicular pursuit, even if that pursuit does not attain excessive speeds or involve reckless driving." *Id.* at 171, 871 P.2d at 718. Section 28–1595(A) provides, "The operator of a motor vehicle who knowingly fails or refuses to bring the operator's motor vehicle to a stop after being given a visual or audible signal or instruction by a peace officer . . . , is guilty of a class 2 misdemeanor."[6]

■ ¶ 17 After the deputies had activated their emergency lights, signaling Hernandez that he must stop, he did not stop on the wide shoulder of the road. He turned onto the private driveway and continued driving "to the back side of the residence down the driveway," where he began exiting the vehicle. Deputy Gilbert exited the patrol car quickly and ordered Hernandez back into his car for officer safety and to prevent him from leaving the area. Although it was a short period between the activation of the lights and Hernandez's entry onto the driveway, this sequence of events followed several minutes during which the deputies followed Hernandez while he made numerous random turns in what a reasonable observer could have interpreted as an attempt to lose the patrol car. At the time Hernandez entered the driveway, the deputies were unaware that he had any connection to the property. Under the totality of the circumstances, a reasonable deputy in that situation could

---

**5.** Neither Deputy Villa nor Deputy Gilbert mentioned either statute as a justification for following Hernandez onto private property. Nor did the state raise either of these arguments below. However, "[w]e are required to affirm a trial court's ruling if legally correct for any reason and, in doing so, we may address the state's arguments to uphold the court's ruling even if those arguments otherwise could be deemed waived by the state's failure to argue them below." *State v. Boteo-Flores*, 230 Ariz. 551, ¶ 7,

288 P.3d 111, 113 (App. 2012). This holds true even if the issue is fact-intensive, as long as "the state is presenting an argument to uphold the court's ruling" and "the factual record developed at the suppression hearing is sufficient for our review." *Id.* ¶¶ 9–10.

**6.** A class 2 misdemeanor is punishable by up to four months in jail. A.R.S. § 13–707(A)(2).

have concluded that Hernandez was attempting to elude him.[7] The deputies had probable cause to believe Hernandez was violating either § 28–622.01 or § 28–1595(A).[8]

¶ 18 Hernandez and the dissent also contend that there were no public safety issues, no concern that Hernandez was attempting to flee and, therefore, no realistic probability of a conviction for flight from an officer. First, Deputy Gilbert clearly stated that he exited and approached the vehicle on his own because he was concerned about both public safety and flight. Second, Hernandez's analysis adopts facts about the occupants of the home different from what he initially stated, and the true circumstances were only discovered later through investigation. If Hernandez had pulled into a driveway and backyard of a stranger, the concerns of Deputy Gilbert would have had even greater force. Finally, whether Hernandez could have been convicted of flight from law enforcement involves elements far beyond the reasonableness of the deputies' conduct here.

¶ 19 As previously noted, although in some circumstances "the gravity of the underlying offense" is an important factor in determining whether an exigency exists, *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091, law enforcement in continuous pursuit of a suspect for investigation of minor offenses may justify a warrantless intrusion into the curtilage of a constitutionally protected area. *See Johnson*, 256 F.3d at 908 n.6.[9]

¶ 20 In 2013, the U.S. Supreme Court clarified that it had never laid down "a categorical rule for all cases involving minor offenses, saying only that a warrant is 'usually' required." *Stanton v. Sims*, — U.S. —, 134 S.Ct. 3, 6, 187 L.Ed.2d 341 (2013) (per curiam), *quoting Welsh*, 466 U.S. at 750, 104 S.Ct. 2091. Noting that "neither *Welsh* nor *Johnson* involved hot pursuit," the Court stated that, "despite our emphasis in *Welsh* on the fact that the crime at issue was minor—indeed, a mere nonjailable civil offense—nothing in the opinion establishes that the seriousness of the crime is equally important *in cases of hot pursuit.*" *Stanton*, — U.S. —, 134 S.Ct. at 6. The Court also noted that California properly had refused to limit the hot pursuit exception to felony suspects in two cases: *People v. Lloyd*, 216 Cal.App.3d 1425, 265 Cal.Rptr. 422 (1989), and *In re Lavoyne M.*, 221 Cal.App.3d 154, 270 Cal.Rptr. 394 (1990). *Stanton*, — U.S. —, 134 S.Ct. at 7. We find these cases persuasive.

¶ 21 In *Lloyd*, a police officer activated his emergency lights to effect a stop after observing the appellant's brother Calvin run a red light. 265 Cal.Rptr. at 423. Calvin refused to pull over, accelerating and running a stop sign before finally parking on the curb in front of a house. *Id.* Law enforcement then approached him and asked for his license and

---

**7.** Hernandez maintains he did not try to flee or elude the deputies. But the only other plausible explanation for his behavior is that he chose the backyard portion of the driveway as a safe location to pull over for the traffic stop, implicitly consenting to the deputies' presence on the curtilage, and therefore lacked a reasonable expectation of privacy there. *Cf. State v. Fleischman*, 157 Ariz. 11, 14–15, 754 P.2d 340, 343–44 (App. 1988) (implied consent to search can arise out of defendant's 9–1–1 call reporting crime at location later searched). Put another way, either Hernandez stopped for the deputies, or he did not. He is not entitled to both conflicting interpretations.

**8.** We do not hold that a driver who stops as soon as is reasonably practicable will generate reasonable suspicion of flight merely because he failed to stop immediately. We hold only that under the totality of the circumstances in this case, the deputies reasonably could have believed that Hernandez was attempting to elude them.

**9.** Our dissenting colleague disagrees with this assessment, but principally relies on inapposite cases that do not involve hot pursuit. *See Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 1414–17, 185 L.Ed.2d 495 (2013) (warrantless intrusion without any exigency); *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (plain view doctrine); *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (four-day warrantless search after an emergency entry responding to gunshots); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (police "entered the house and began to search for a man of the description they had been given"); *United States v. Struckman*, 603 F.3d 731, 745 (9th Cir. 2010) (suspect did not attempt to run); *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009) (entry under the emergency exception); *Johnson*, 256 F.3d at 898 (attempt to locate suspect who had last been seen thirty minutes prior).

registration. *Id.* He refused to comply, instead retreating into the house, telling an officer that he was not going to give him a "damn ticket." *Id.* Calvin's brother, appellant Willie, told the officers they could not enter without a warrant. *Id.* The officers then forced their way in and placed Calvin and Willie under arrest. *Id.* The *Lloyd* court held that the detention clearly began in public, and that "Calvin's conduct in quickly walking away from the officer rather than complying with the demand for identification provided the officer with probable cause to arrest him" for a misdemeanor under Cal. Penal Code § 148.[10] *Lloyd*, 265 Cal.Rptr. at 424–25.

¶ 22 *Lavoyne M.* presented similar circumstances. There, having observed a vehicle run multiple stop signs, an officer activated his lights and siren in an attempt to effectuate a stop, but the driver refused to pull over. 270 Cal.Rptr. at 394. Eventually the car did stop in front of a house, and the driver ran inside. *Id.* at 395. An officer recognized the driver from prior contact as a minor too young to have a driver's license, indicating a civil traffic violation. *Id.* The officer immediately followed the driver into the home, and placed him under arrest. *Id.* The *Lavoyne M.* court held that the "[m]inor's refusal to comply with the attempts to detain him provided probable cause for the officer to arrest him," citing Cal. Penal Code § 148 and *Lloyd. Lavoyne M.*, 270 Cal.Rptr. at 396.

¶ 23 In addition to California, several jurisdictions have held that the hot pursuit exigency applies to cases involving less serious offenses. In *Middletown v. Flinchum*, 95 Ohio St.3d 43, 765 N.E.2d 330, 332 (2002), a case the trial court here relied on in denying Hernandez's motion, the Ohio Supreme Court held:

> Although *Santana* deals with the issue of warrantless home arrests in the context of a felony suspect, we see no reason to differentiate appellant's offense and give him a free pass merely because he was not charged with a more serious crime. The basic fact remains that appellant fled from police who were in lawful pursuit of him

and who had identified themselves as police officers.

Illinois, Massachusetts, and Wisconsin have all adopted similar rules. *People v. Wear*, 371 Ill.App.3d 517, 311 Ill.Dec. 41, 867 N.E.2d 1027, 1042 (2007) ("[T]he doctrine of hot pursuit does not care whether it was a *Terry* stop or an arrest that the police officer set in motion before pursuing a suspect into a private place."), *aff'd*, 229 Ill.2d 545, 323 Ill.Dec. 359, 893 N.E.2d 631 (2008); *Commonwealth v. Jewett*, 471 Mass. 624, 31 N.E.3d 1079, 1089 (2015) (noting "such a categorical distinction would arbitrarily permit perpetrators of serious misdemeanors 'to avoid punishment merely because of how the legislature had labelled an infraction' "), *quoting State v. Paul*, 548 N.W.2d 260, 267 (Minn. 1996); *State v. Weber*, 372 Wis.2d 202, 887 N.W.2d 554, ¶ 33 (2016) ("[T]he mere fact that the underlying offenses at issue in this case are misdemeanors is not a bar to application of the hot pursuit doctrine.").

¶ 24 A minority of jurisdictions have applied a more stringent standard in cases of hot pursuit. In *State v. Bolte*, 115 N.J. 579, 560 A.2d 644 (1989), a case the trial court here declined to follow, the Supreme Court of New Jersey held that an officer in hot pursuit of a driver observed committing numerous traffic infractions violated the Fourth Amendment by following him first into his driveway, then into his garage, and finally into his house where the officer effected an arrest, stating:

> We reject the State's contention that hot pursuit alone can support a warrantless entry into a home. Although the State argues that citizens should not be encouraged to elude arrest by retreating into their homes, the question whether hot pursuit by police justifies a warrantless entry depends on the attendant circumstances.

*Id.* at 654.

¶ 25 Even were we to adopt the reasoning in *Bolte*, this case is distinguishable on several grounds. First, the officer followed Bolte first into his driveway, then into his garage, then into the home itself, and finally made

---

10. Section 148(a)(1), Cal. Penal Code, makes it a crime to "willfully resist[ ], delay[ ], or obstruct[ ] any ... peace officer ... in the discharge or

attempt to discharge any duty of his or her office or employment."

the arrest upstairs in his bedroom. *Id.* at 645–46. Here, Hernandez was stopped outside the home and the deputies never entered it.[11] Second, the officer in *Bolte* had reason to know that the home belonged to the defendant. *See State v. Bolte*, 225 N.J.Super. 335, 542 A.2d 494, 496 (1988) (garage door opened automatically). Hernandez's vehicle was registered to a different address, and the deputies were unaware of his having any connection to the property until well after the arrest. Finally, Deputy Gilbert testified to his belief that Hernandez may have been attempting to flee, and that immediate contact was necessary to prevent potential harm to the community. In light of these circumstances, the deputies acted reasonably and in a constitutionally sound manner when they pursued Hernandez onto the home's curtilage to effect the stop.

■ ¶ 26 To the extent Hernandez and the dissent contend it is bad policy to authorize law enforcement to stop a motorist to investigate the absence of vehicle insurance, the criticism can only be addressed by the legislature. It has concluded that driving without insurance is an offense that requires law enforcement authority to stop a vehicle suspected of lacking insurance, A.R.S. §§ 28–1594, 28–4033; further, refusal to stop for this offense is punishable as a misdemeanor or a felony, A.R.S. §§ 28–622.01, 28–1595(A). It is within the legislature's power to prohibit driving without insurance without authorizing officers to stop motorists for such a violation, but it decided otherwise. *See, e.g.*, A.R.S. § 28–909 (failure to wear seatbelt is traffic violation, but no authority to stop motorist driving without a seatbelt "unless the peace officer has reasonable cause to believe there is another alleged violation of a motor vehicle law"); Tucson City Code § 20–160 (no law enforcement authority to stop motorists violating hands-free cell phone ordinance). Moreover, assessing the reasonableness of law enforcement's conduct under the Fourth Amendment takes into account the decision of the state legislature regarding the seriousness of the offense and the authority of offi-

cers to investigate it. *See Welsh*, 466 U.S. at 754, 104 S.Ct. 2091 (statute is "best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest").

¶ 27 In sum, Hernandez's attempt to elude law enforcement by entering a private driveway constituted probable cause that he was attempting to flee, despite the fact that the reason for the stop was a civil traffic violation. The Fourth Amendment does not require that the deputies must "shrug [their] shoulders and go obtain a warrant" when the initial violation was for a minor offense.[12] *Wear*, 311 Ill.Dec. 41, 867 N.E.2d at 60. "Law enforcement is not a child's game of prisoner['］s base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot." *State v. Blake*, 468 N.E.2d 548, 553 (Ind. Ct. App. 1984). A police officer in continuous vehicular pursuit of a person under investigation for a violation of the law cannot be arbitrarily stopped by the person's entry onto private property. Any contrary rule would encourage flight to avoid apprehension, identification, and prosecution. *Id.*

### Disposition

¶ 28 For the foregoing reasons, we affirm the trial court's denial of Hernandez's motion to suppress. Accordingly, Hernandez's convictions and sentences are affirmed.

STARING, Presiding Judge, dissenting:

¶ 29 The crux of the majority's analysis is that Hernandez's act of turning into the driveway—making a "lengthy swooping turn" mere seconds after the activation of the emergency lights—provided deputies with both probable cause to arrest him for willful, felony flight and exigent circumstances that permitted a physical intrusion onto constitutionally protected curtilage. I disagree.

¶ 30 While reasonableness is the "touchstone" of Fourth Amendment analysis,

---

11. We need not decide and do not decide whether the result would have been the same had Hernandez entered the house before officers arrived.

12. For the same reasons, we find no violation of article II, § 8 of the Arizona Constitution.

"[r]easonableness ... depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), *quoting United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). And "the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

¶ 31 "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), *quoting United States v. U.S. Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). As noted, curtilage, "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" is considered part of the home. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), *quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *overruled on other grounds as recognized by Fisher v. United States*, 425 U.S. 391, 407, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *see also State v. Olm*, 223 Ariz. 429, ¶ 5, 224 P.3d 245, 247 (App. 2010) (Fourth Amendment protection extends to curtilage).

¶ 32 The majority diminishes the constitutional protection afforded to curtilage, as well as recent developments in constitutional law. For example, it advances the principle that a driveway is only "semiprivate." *Ante* ¶12. But the deputies not only followed Hernandez up the driveway, but also into the backyard, which the trial court correctly determined was curtilage. *See Olm*, 223 Ariz. 429, ¶¶ 11, 17, 224 P.3d at 249–50 (unenclosed front yard where defendant parked car, abutting front patio, constituted protected curtilage). The

court also correctly concluded Hernandez possessed a reasonable expectation of privacy in the backyard. *See id.* ¶ 17 (officer's inspection of automobile VIN plate in front yard was "prohibited warrantless search").[13]

¶ 33 Furthermore, the Supreme Court has explained that the expectation-of-privacy test espoused in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), "did not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'" *United States v. Jones*, 565 U.S. 400, 407, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), *quoting United States v. Knotts*, 460 U.S. 276, 286, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (Brennan, J., concurring). "[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 409, 132 S.Ct. 945. And, since *Florida v. Jardines*, we are required to consider two questions: (1) whether deputies physically intruded into a constitutionally protected area; and, if so, (2) whether their investigation involved an unlicensed physical intrusion. 569 U.S. 1, 133 S.Ct. 1409, 1415–17, 185 L.Ed.2d 495 (2013). If we conclude affirmatively to both, in the absence of exigency, then their actions violated the Fourth Amendment. *See id.* at 10–13, 133 S.Ct. at 1417–18.[14]

¶ 34 In need of an actual crime to find exigency, the majority reaches to accept the state's characterization of Hernandez's actions as illegal flight. The state argues "it is irrelevant that [Hernandez] was not subject to arrest for the civil traffic violation because, by the time [the] deputies followed [Hernandez] into the backyard, they had probable cause to arrest him for a felony offense," citing A.R.S. § 28–622.01, or, in the alternative, a misdemeanor pursuant to A.R.S. § 28–1595(A). Neither statute applies here.

¶ 35 The majority overlooks several significant facts in concluding the deputies had

---

13. The majority does not discuss our decision in *Olm*.

14. Here, the deputies' physical intrusion into the curtilage of the home when they drove up the

driveway and into the backyard was not something subject to "customary invitation." *Id.* at 9, 133 S.Ct. at 1416.

probable cause to arrest Hernandez for felony flight.[15] The deputies activated their emergency lights as they were passing through an intersection. At the time the deputies activated their lights, Hernandez's car was approaching or in front of the first house past the intersection. Hernandez, no more than "a few ... seconds" later, made a "lengthy swooping turn" into a driveway between the first and second houses past the intersection and "pulled around to the back side of the residence down the driveway," where the deputies followed him.

¶ 36 Section 28–622.01 provides, "A driver of a motor vehicle who willfully flees or attempts to elude a pursuing official law enforcement vehicle ... is guilty of a ... felony." We have interpreted "attempt to elude" to connote "adroit maneuvers ... [;] quick turns, driving with the lights off, driving where the pursuing vehicle could not follow, or attempting to hide." *State v. Fogarty*, 178 Ariz. 170, 172, 871 P.2d 717, 719 (App. 1993). "The term 'flee' usually, but not always, connotes speed." *Id.* Here, Hernandez turned into a close-at-hand residential driveway before "pull[ing] around to the back side of the residence down the driveway," where he stopped and complied with the deputies' orders. This action describes neither a willful flight nor an attempt to elude as we have interpreted those terms.

¶ 37 Section 28–1595(A) provides, "The operator of a motor vehicle who knowingly fails or refuses to bring the operator's motor vehicle to a stop after being given a visual or audible signal or instruction by a peace officer ... is guilty of a ... misdemeanor." Hernandez did not fail or refuse to bring his car to a stop, however, but brought it to a stop in the backyard shortly after the activation of the lights. When the deputies activated their lights, Hernandez was approaching or already in front of the first house beyond the intersection, which is adjacent to the driveway he entered. It was no more than "a few ... seconds" before Hernandez was in front of the driveway, and neither deputy testified he increased his speed, made a quick turn, turned off his lights, or attempted to hide when he proceeded into the backyard. *See Fogarty*, 178 Ariz. at 172, 871 P.2d at 719. It is unreasonable to conclude a person who brings his car to a stop within seconds of being instructed to do so gives officers probable cause to believe a violation of § 28–1595(A) has occurred.[16]

¶ 38 "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime' while giving 'fair leeway for enforcing the law in the community's protection.' " *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), *quoting Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). At the same time, " '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371, 124 S.Ct. 795, *quoting Brinegar*, 338 U.S. at 175, 69 S.Ct. 1302 (citations omitted). There was no reasonable, particularized ground to believe Hernandez was attempting to flee simply because he made a "lengthy swooping turn into the driveway" seconds after the deputies activated their lights—a conclusion that finds support in the fact neither deputy mentioned

---

**15.** The majority asserts the "angle of the turn is not dispositive of the Fourth Amendment issue," *ante* n.2, but the nature and timing of the turn are relevant to whether the deputies had probable cause to believe Hernandez was committing felony flight.

**16.** According to the National Highway Traffic Safety Administration (NHTSA), it typically takes a person 0.75 seconds to perceive an event while driving and an additional 0.75 seconds to react and move one's foot to the brake pedal. Nat'l Highway Traffic Safety Admin., U.S. Dep't of Transp., *Safety in Numbers*, at 1 (August 2015), https://one.nhtsa.gov/nhtsa/Safety1nNum3ers/august2015/S1N_Speeding–August2015_812008.pdf. Thus, at speeds of 20, 30, 40, 55, 65, and 70 miles per hour, a car has already travelled 44, 76, 88, 121, 143, and 154 feet, respectively, before it has even begun to slow down in response to a stimulus. *Id.*

the flight statute as a justification for following Hernandez onto private property.

¶ 39 The majority also disregards the fact that " '[o]ne suspected of committing a minor offense would not likely resort to desperate measures to avoid arrest and prosecution,' so any inference of danger or escape from the commission of the offense alone is not reasonable." *United States v. Struckman*, 603 F.3d 731, 745 (9th Cir. 2010), *quoting United States v. George*, 883 F.2d 1407, 1413 n.3 (9th Cir. 1989) (alteration in *Struckman*). Here, the only reason for the stop was the suspicion Hernandez was driving without insurance—a civil infraction. Therefore, we cannot reasonably infer, and it would be unreasonable for the deputies to suspect, that Hernandez was attempting to flee.[17]

¶ 40 In addition, applying the majority's rationale, anything other than stopping almost instantaneously could give officers probable cause to believe a driver is engaged in felony flight. Thus, for example, drivers who do not immediately notice emergency lights, or, concerned about their personal safety, drive to well-lit, public places before pulling over, could potentially face arrest for felony flight, and also be subject to a search incident to arrest. *See* A.R.S. § 13–3883(A); *see also State v. Snyder*, 240 Ariz. 551, ¶ 17, 382 P.3d 109, 114 (App. 2016) (search incident to lawful arrest).[18]

¶ 41 Because the officers only had reason to suspect Hernandez of a civil infraction, the trial court mistakenly relied on *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49

L.Ed.2d 300 (1976), when denying the motion to suppress. And the majority relies on *Santana* for the immaterial observation that hot pursuit "need not be an extended hue and cry 'in and about (the) public streets,' " and "[t]he fact that [a] pursuit . . . ended almost as soon as it began [does] not render it any the less a 'hot pursuit' sufficient to justify [a] warrantless entry." 427 U.S. at 43, 96 S.Ct. 2406. Nothing in *Santana* provides legal cover for the state in this case.

¶ 42 Following Hernandez up the driveway and into the backyard to investigate whether he had automobile insurance could not reasonably be considered a "hot pursuit," subject to the holding of *Santana*, in which officers had probable cause to make an arrest for selling heroin. *Id.* at 41–42, 96 S.Ct. 2406. As noted, "hot pursuit" involves "some element of a chase," *id.* at 42 n.3, 96 S.Ct. 2406, and "immediate or continuous pursuit . . . from the scene of a crime," *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091. Nothing here reasonably could be described as "hot pursuit" and there was no crime, only the possibility of a civil infraction. Indeed, as the trial court concluded, "[t]here was no probable cause or reasonable suspicion that [Hernandez] was engaged in any criminal activity, prior to his detention."

¶ 43 Further, the hot pursuit exception envisions a situation in which "delay in the course of an investigation . . . would gravely endanger [officers'] lives or the lives of others," *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), or where "any delay

---

**17.** The majority asserts that if Hernandez was not attempting to elude the deputies, he implicitly consented to their presence on the curtilage, citing *State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340 (App. 1988). *Ante* n.7. In *Fleischman*, we held:

> When a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. *So long as that individual is not a suspect in the case* or does nothing to revoke his consent, the police may search the premises for these purposes.

157 Ariz. at 15, 754 P.2d at 344 (emphasis added). I fail to understand how this principle applies to the case at hand.

**18.** The majority believes the deputies' actions were reasonable given the "totality of the circumstances," particularly the series of turns Hernandez made before they activated their lights. *Ante* ¶17. The three turns the deputies described Hernandez making after they were behind him (a left turn, followed by a right turn and then another left) were not illegal and resulted in him arriving at his girlfriend's home. The deputies did not observe any moving violations, and the sole reason for the stop was the possible insurance violation. On this record, what the majority describes as the "totality of the circumstances" would encompass many people engaged in innocent behavior.

would result in destruction of evidence," *Santana*, 427 U.S. at 43, 96 S.Ct. 2406. Here, based on what the deputies knew at the time they initiated the stop, there was no danger to them or the public, or any possibility of the destruction of evidence, if they had delayed their investigation of the civil infraction. *Cf. Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (evaluating alleged Fourth Amendment violation, court objectively assesses officer's actions in light of facts and circumstances known at time).

¶ 44 The majority also diminishes the Supreme Court's view of the significance of the "the gravity of the underlying offense" in determining exigency. *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091. The exception for exigent circumstances rarely applies "in the context of a home entry ... when there is probable cause to believe that only a minor offense ... has been committed." *Id.* Additionally, "an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009), *quoting LaLonde v. County of Riverside*, 204 F.3d 947, 956 (9th Cir. 2000); *United States v. Johnson*, 256 F.3d 895, 908 n.6 (9th Cir. 2001) ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases."), *citing Welsh*, 466 U.S. at 753, 104 S.Ct. 2091. In *Welsh*, the Supreme Court noted "that it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." 466 U.S. at 753, 104 S.Ct. 2091. Here, of course, there was no underlying crime, not even a misdemeanor or minor offense, but only a possible civil infraction.

¶ 45 The majority goes on to read *Johnson* expansively, stating, "while in some circumstances 'the gravity of the underlying offense' is an important factor in determining whether an exigency exists, ... law enforcement in pursuit of a suspect is one of the rare cases where even relatively minor offenses may justify a warrantless intrusion into a constitutionally protected area." *Ante* ¶19. I struggle to see how this conclusion can originate from a footnote that concludes: "In situations where an officer is truly in hot pursuit and the underlying offense is a felony, the Fourth Amendment usually yields.... However, in situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." 256 F.3d at 908 n.6, *citing Welsh*, 466 U.S. at 753, 104 S.Ct. 2091.

¶ 46 Lastly, the majority attempts to diminish consideration of the gravity of the underlying offense by discussing the Court's decision in *Stanton v. Sims*, ── U.S. ──, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013). *Ante* ¶20. There, discussing *Welsh*, the Court noted "nothing in the opinion establishes that the seriousness of the crime is equally important *in cases of hot pursuit.*" *Id.* at ──, 134 S.Ct. at 6. The majority appears to take this to be the end of the inquiry but does not acknowledge what was actually at issue in *Stanton*.

¶ 47 In *Stanton*, officers "responded to a call about an 'unknown disturbance' involving a person with a baseball bat" and upon arriving at the scene, saw a man cross the street in front of their car and run towards a residence belonging to Sims. ── U.S. ──, 134 S.Ct. at 3–4. One of the officers "decided to detain him," got out of his car, called out "police," and ordered the man to stop. *Id.* at ──, 134 S.Ct. at 4. He did not stop, but instead went through the front gate of the fence enclosing Sims's front yard. *Id.* Believing that the man had committed a jailable misdemeanor "by disobeying his order to stop" and fearing for his safety, the officer kicked open the gate. *Id.* "The swinging gate struck Sims, cutting her forehead and injuring her shoulder." *Id.* Sims filed suit against the officer under 42 U.S.C. § 1983, alleging he had "unreasonably searched her home without a warrant in violation of the Fourth Amendment." *Id.*

¶ 48 The issue before the Court was whether the officer was entitled to qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Id., quoting Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Court concluded that "at the time [the officer] made his split-second decision," there was sharp division between federal and state courts "on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect." *Id.* at ——, ——, 134 S.Ct. at 5, 7. Thus, the actions of the officer were not "beyond debate," *id.* at ——, 134 S.Ct. at 7, *quoting Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), and he was not "plainly incompetent," *id., quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The Court did not "express any view on whether [the officer's] entry into Sims' yard in pursuit of [the suspect] was constitutional." *Id.*

¶ 49 In *Arizona v. Hicks,* writing for the majority, Justice Scalia observed "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." 480 U.S. 321, 329, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). And "the mere fact that law enforcement may be made more efficient can never by itself justify disregard for the Fourth Amendment." *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408. Here, deputies encroached upon constitutionally protected curtilage to make contact with Hernandez solely to investigate a civil infraction. This intrusion, without a warrant, was per se unreasonable unless the state could demonstrate an exigent circumstance, which it has failed to do. *See Jardines,* 569 U.S. 1, 133 S.Ct. at 1414–17; *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735; *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). I respectfully dissent.